Vincent P. BRADY, Plaintiff,

v.

TRANS WORLD AIRLINES, INC., a corporation of the State of Delaware, and the International Association of Machinists, an unincorporated association, Defendants.

Civ. A. No. 1834.

United States District Court
D. Delaware.

Nov. 4, 1963.

See also D.C., 196 F.Supp. 504; D.C., 174 F.Supp. 360.

Irving Morris and Joseph A. Rosenthal of Cohen & Morris, Wilmington, Del., for plaintiff, (withdrew after trial, plaintiff now appears pro se).

Stephen E. Hamilton, Jr., of Richards, Layton & Finger, Wilmington, Del., Edward R. Neaher and Richard S. Harrell, of Chadbourne, Parke, Whiteside & Wolff, New York City, of counsel, for defendant, Trans World Airlines, Inc.

H. Albert Young and Bruce M. Stargatt, of Morford, Young & Conaway, Wilmington, Del., Edward J. Hickey, Jr., and James L. Highsaw, Jr., of Mulholland, Robie & Hickey, Washington, D. C., of counsel, for defendant, International Ass'n of Machinists.

CALEB M. WRIGHT, Chief Judge.

This is an action by an employee alleging that he was discharged from his job in violation of the Railway Labor Act.[1] The complaint seeks reinstatement and damages. Plaintiff, Vincent P. Brady, was and is a resident of Delaware. Defendant, Trans World Airlines, Inc., (TWA) is a Delaware corporation. Defendant, International Association of Machinists (IAM) is an unincorporated Labor Union. There is no diversity of citizenship. Damages have been severed from liability and this opinion deals only with the latter question.

In 1951, Brady was hired by TWA and worked for the company at the Philadelphia International Airport until May of 1956, the date of the alleged wrongful

[1] The Section relied upon is 45 U.S.C. § 152, particularly Section 152, Eleventh (a), of the Railway Labor Act. This Section is made applicable to carriers by air, 45 U.S.C. § 181.

discharge.[2] He was a member of the IAM Local Lodge 1776 during this period. At a meeting of the Local on November 2, 1955, the membership voted to increase dues for workers in Brady's classification from $3.00 to $3.25.[3] Plaintiff was not present at this meeting but at the next session appeared and challenged the legality of the dues increase.[4]

In the meantime, Gerald C. Coleman was elected financial secretary of the Local Lodge and took office early in January of 1956.[5] Upon taking office he endeavored to get all members of the Union whose dues were in arrears to pay what they owed. Coleman posted a list of delinquent members [6] and on February 15th posted another list of all members who were in arrears two or more months. These members were given ten days to pay on pain of being cited to the District Lodge. Everyone complied with the notice except plaintiff who steadfastly refused to pay or tender dues other than at the old rate of $3.00.[7] He maintained this position even when asked by a Lodge officer to tender at the new rate under protest. The only reason given by plaintiff in justification of nonpayment was the illegality of the increase. On March 3, 1956 Coleman cited the plaintiff and requested District General Chairman Miller to cancel the plaintiff's membership in the IAM.

Miller was away from headquarters when the citation was received and first became aware of Brady's delinquency on March 13, 1956.[8] Miller saw Brady at the Airport in Philadelphia at this time and spoke to him about the dues.[9]

Plaintiff explained his position and Miller advised him to pay under protest and appeal through channels.[10] Brady then received a letter dated March 13th advising him to get in good standing by paying his dues. The request asked for unpaid dues including those for the month of March.[11] On March 27th, Brady sent a check to Coleman in the amount of $10.50 for dues for December 1955, January and February 1956, but did not send the March dues as requested in the letter of March 13th.[12]

This check was returned to Brady with a letter from Coleman which stated, "this amount $10.50 is not sufficient to cover your dues and reinstatement fee."[13] The letter then demanded payment of $34.75 by April 4th to cover the reinstatement fee and three months dues. Miller, however, upon learning of the demand, decided it was in error and wrote Brady that a $25 reinstatement fee was sufficient.[14] Plaintiff then asked permission to pay dues alone but his request was refused. On May 1, 1956, Miller requested Brady's discharge under the terms of the union shop agreement with TWA. Plaintiff appealed to the System Board of Adjustment. The Board upheld his discharge.

Plaintiff filed his complaint on May 10, 1957 and the case is now in the posture for final decision. Brady contends first that his discharge, committed at the behest of the Union, was prompted by the Union's hostile discrimination against him. Such conduct would be a breach of the bargaining agent's duty of fair representation and, if proven, appro-

---

2. Brady also worked for TWA from October 1, 1946 to May, 1949.

3. PX 25.

4. Tr. 24, 25.

5. Tr. 202.

6. Tr. 221.

7. Tr. 38, 325–26.

8. Tr. 356.

9. Tr. 356–57.

10. Tr. 384.

11. PX 3. On March 13, 1956 Brady had not paid dues for December, January, February and March. Tr. 52.

12. Tr. 42. Brady mistakenly believed the dues increase had been $.50 rather than $.25. In attempting to pay three months dues, therefore, he sent $10.50 rather than $9.75. It is not disputed, however, that Brady's tender was intended to, and did, cover three months dues at the new rate.

13. PX 4.

14. PX 14.

priate relief would be granted by the Court. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191 (4 Cir. 1963). Brady's second argument is that the discharge was illegal in that it did not comply with Section 2 (Eleventh) of the Railway Labor Act [15] governing union shop agreements. Because the Court finds Brady has proven facts sufficient to support recovery under this latter theory, the opinion will deal with that issue only, and no facts will be found on the hostile discrimination question.

### I Jurisdiction

Defendants' threshold contention is that the Court lacks subject matter jurisdiction over Brady's claim since it involves application and interpretation of Section 2 (Eleventh) of the Railway Labor Act. That provision reads in part:

"Eleventh. Notwithstanding any other provisions of this chapter, * * * any carrier or carriers * * * and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: Provided, That no such agreement shall require such condition of employment with respect to employees to whom membership is not avail-

able upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." 45 U.S.C. § 152 (Eleventh).

Application and interpretation of this section, it is asserted, is the sole province of the System Boards of Adjustment since particular cases arising under it may involve interpretation of union security agreements and these Boards have exclusive jurisdiction of cases " * * * growing out of grievances, or out of the interpretation or application of agreements * * *." [16] One line of cases has adopted this reasoning. E. g. Battle v. Brotherhood of Railway Clerks & Steamship Clerks, etc., 320 F.2d 742 (D.C. Cir.1963). Another line, however, has held to the contrary and has not found the federal courts powerless to act in cases involving 2 (Eleventh). E. g. Cunningham v. Erie R. R. Company, 266 F.2d 411 (2 Cir. 1959).

This Court finds jurisdiction. Section 2 (Eleventh) is not a self-contained, independent statutory provision. It is a proviso, an exception to an express prohibition of the Act beginning with the words "Notwithstanding any other provisions * * *." Prior to the enactment of this section, all forms of union security were barred by the broad provisions of Section 2 (Fourth) (Fifth) [17] which prohibited all employer conduct designed " * * * to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organiza-

15. 45 U.S.C. § 152 (Eleventh). Hereafter paragraphs of 45 U.S.C. § 152 will be designated simply by their place in Section 2 of the Railway Labor Act, such as 2(First), 2(Second), etc.

16. 45 U.S.C. § 184.

17. 45 U.S.C. § 152 (Fourth) (Fifth). Jurisdiction over this matter has been upheld on these grounds in previous opinions in the case. 196 F.Supp. 504, 506 n. 2 (D.C.Del.1961).

tion * * *." [18] That 2 (Eleventh) was intended by Congress to be a proviso to this prohibition is authoritatively demonstrated by the Senate Report [19] accompanying it. That Report stated, "[it] is intended to relax the prohibitions contained in paragraphs fourth and fifth of section 2 of the Railway Labor Act against all forms of union security agreements * * *." Indeed, Congress explicitly had the Taft-Hartley Act in mind,[20] and the union shop provisions of that statute are merely a proviso to the basic anti-discrimination section.[21] Only when stated loosely, therefore, can plaintiff's claim be said to rest on 2 (Eleventh). More specifically, however, his claim is that because the discharge fell outside that exempting section and is not protected by it, it violated 2 (Fourth) for it was clearly designed "to influence or coerce employees in an effort to induce them to join or remain * * * members of [a] labor organization." [22]

█ Viewing plaintiff's claim in this manner puts the jurisdictional question in a very different light, for relevant decisions of the Supreme Court, as well as common sense, indicate that 2 (Fourth) is fully enforceable by the federal courts. In Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), a district court had issued an injunction restraining the company from interfering with its employees' right to select their bargaining representative freely. The complaint alleged that defendant had coerced members of the plaintiff, the

Railway Clerks, to join the Association of Clerical Employees, a company dominated union. After the injunction issued the defendant proceeded to recognize the Association as the employees exclusive bargaining representative. A contempt citation issued and the company was ordered to disestablish the company union and reinstate the Railway Clerks as the bargaining representative.

█ On appeal, the Supreme Court found authority for the district court action in Section 2 (Third) of the Act. At that time the latter prohibited "* * * interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other * * *", conduct clearly similar to that involved here.[23] 2 (Fourth) was added to the Act four years after that decision and was in large part an amplification of 2 (Third). Indeed, its principal purpose was to prevent employers from coercing employees into joining unions favored by the carriers, the very action enjoined in that case. See Railway Employes' Department, American Federation of Labor v. Hanson, 351 U.S. 225, 231, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). And there can be no doubt that enforcement of 2 (Fourth) was also entrusted to the courts, for no other agencies, least of all the Adjustment Boards, are either equipped or empowered to deal with conduct impairing the statutory right of employees to be free of coercion in choosing bargaining representatives.[24] See Railway Employees Co-op. Ass'n v. Atlanta B. & C. R. Co., 22 F.Supp. 510 (D.Ga.

---

18. In the absence of these prohibitions, the unions and employers would be free to agree to a closed shop, the most stringent union security agreement.

19. S.Rep.No.2262 in Vol. 2 U.S.Code Congressional Serv. 81st Cong. 2nd Sess. 1950, pp. 4319, 4320.

20. Ibid. That Report stated, "[T]he terms of Section 2 (Eleventh) are substantially the same as those of the Labor-Management Relations Act as they have been administered * * *."

21. 29 U.S.C. § 158(a) (3).

22. It is undisputed that Brady's discharge was a result of the Union's claim that he had not fulfilled his membership obligations in the Union.

23. The wording of the statute has been changed slightly. It now reads, "* * * interference, influence, or coercion by either party over the designation of representatives by the other; * * *." Act of June 21, 1934, c. 691 § 2, 48 Stat. 1186.

24. Under 2 (Fourth), this freedom encompasses the right *not* to join a union.

1938) (enforcing 2 (Fourth)); Virginian Railway Co. v. System Federation No. 40, Railway Employees Department of the American Federation of Labor, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (enforcing 2 (Ninth)).

■■ To hold the interrelationship of 2 (Fourth), (Fifth) and (Eleventh) must be applied and interpreted solely by the Adjustment Boards, moreover, violates common sense. The argument supporting such a holding is merely that public statutory rights, when incorporated into a collective agreement, become exclusively private contract rights. Even when stated in that fashion, the argument is not convincing, for there is no reason why concurrent procedures may not exist for the enforcement of these distinct rights. But viewed in the context of enforcement of contract rights under the Railway Labor Act, it is untenable. Application and interpretation of agreements executed under that statute are the sole province of the Adjustment Boards, which are composed of representatives of the contracting parties, the employer and the union.[25] But 2 (Fourth) (Fifth) (Eleventh) embody statutory rather than contract rights and are important legislative limitations on the conduct of the very parties who make up those Boards. To entrust these parties with interpretation and enforcement of restrictions on themselves is little better than leaving them completely free to begin with. Indeed, if application and interpretation of 2 (Eleventh) is the sole province of the Adjustment Boards, then Congress did not "relax" the prohibitions

of 2 (Fourth) (Fifth) by enacting 2 (Eleventh); it repealed them.[26]

All of this can be illustrated by hypothetical situations indistinguishable on principle from the présent case. If a collective agreement contained a clause having language identical to Section 2 (Fourth) without a union shop clause, would an employee discharged for failing to join the union be relegated merely to the Adjustment Boards, agencies composed of the parties which had combined to discharge him? Would a federal court be compelled to hold Congress intended that its jurisdiction would be preempted by a contract enforceable only in an agency composed of the contracting parties? Or if, instead of that provision, the agreement had a union shop clause containing much of the language of 2 (Eleventh), and the incumbent union refused a valid tender of dues and caused an employee to be discharged because he was a member of another union challenging the incumbent, did Congress intend the only remedy to be in an Adjustment Board composed of representatives of the incumbent and the employer? C. f. Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, supra. If defendants' argument is correct, however, in both these situations resort must be solely to the Adjustment Boards even though, in the absence of a collective agreement parroting the statutory language, jurisdiction would clearly lie in the federal courts.[27]

■ Nor is there any overriding policy compelling courts to eschew jurisdiction over such cases in favor of the Ad-

25. Article XII(b) of the TWA-IAM collective agreement provides:
 "The System Board of Adjustment shall consist of four (4) members, two (2) selected by the Company and two (2) selected by the Union."

26. Compulsory unionism is by no means a dormant political issue in the United States, and only the strongest possible legislative history can override the common sense conclusion that Congress did not leave enforcement of the detailed provisions of 2 (Eleventh) to the very parties it was designed to restrict. And,

indeed, this conclusion avoids serious constitutional questions. See Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243 (1926).

27. Indeed, if defendants are correct, then enforcement of the doctrine recently enunciated in International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1960), may be taken from the federal courts and left solely with the Adjustment Boards merely by paraphrasing the holding of that decision as a contractual provision.

justment Boards. Composed of representatives of the contracting parties, they are designed to encourage private settlements of disputes as to the meaning of contracts. This policy, however, is surely inapposite where, as here, statutory limitations on the power of the contracting parties to engage in certain conduct or to agree to certain matters is involved.

Another purpose of the Adjustment Boards is to bring to the task of interpretation of collective agreements the specialized background of the Board members. And since in 2 (Eleventh) cases, the union shop provisions of the contract may well be relevant to the determination of whether the employee was discharged "for any reason other than the failure * * * to tender the periodic dues * * * ", courts may be compelled to undertake incidental "interpretation" of that portion of the contract. This is not, however, an overriding consideration. For one thing, since the employer and the union have already agreed on the validity of the discharge, it is hardly to be expected that the Board will rely heavily on expertise in reviewing the case. In any event, expertise in construing collective agreements is not expertise in enforcing statutory mandates. Union shop clauses, moreover, are not likely to raise difficult questions of interpretation. 2 (Eleventh) itself goes very far to write the parties' contract in this respect and leaves relatively few matters for private determination, little more in fact than the date on which dues must be paid, the amount, and procedures for discharge. In any case, if the particular union shop clause is ambiguous, the need for judicial protection may be greater for the opportunities for discrimination will be correspondingly increased. There is little reason indeed why such a clause should be vague for, given a desire to comply with 2 (Eleventh), all that is necessary is a clear rule uniformly applied. While questions of interpretation may arise, therefore, they are not such as to require the federal courts to abstain from exercising jurisdiction in these cases.

## II· *The Merits*

The contract between IAM and TWA provides:

"(a) Each employee now or hereafter employed in any work covered by this agreement shall, as a condition of continued employment in such work, within sixty (60) days following the beginning of such employment or the effective date of this Article, whichever is later, become a member of, and thereafter maintain membership in good standing (as herein defined), in the Union, except as provided otherwise herein. Such condition shall not apply * * * with respect to any employee to whom membership is denied or terminated for any reason other than the failure of the employee to tender the dues uniformly required of other members of his classification (and at his point on the Company's system) as a condition of acquiring or retaining membership.

"For the purpose of this Article, 'membership in good standing in the Union' shall consist of the payment by the employee of dues for each calendar month, not later than the last day of the following calendar month, which are uniformly required of members of his classification (and at his point on the Company's system) as a condition of acquiring or retaining membership.

\* \* \* \* \* \*

"(e) When an employee becomes delinquent by not meeting the requirements of (a) above for 'membership in good standing in the Union', the following procedure shall be observed:

"(1) The General Chairman of the Union shall notify the employee by registered letter, return receipt requested, copy to the Company's Vice President of Industrial Relations, that

the employee is delinquent in the payment of dues as specified herein and accordingly is subject to discharge as an employee of the Company. * *

\* \* \* \* \* \*

"(n) Whenever the term dues is referred to in this Article, such use of the word 'dues' shall include initiation or reinstatement fees, periodic dues, and assessments (not including fines and penalties), * *."

Under the TWA–IAM collective bargaining agreement membership in good standing meant the payment by the employee of dues for each calendar month, not later than the last day of the following calendar month. On March 13, 1956, the Union sent Brady a letter demanding dues for December, January, February and March. Under the plain terms of the contract, however, plaintiff owed only two months dues. December dues were owing no later than January 31st, January dues were owing no later than February 28th but February dues did not have

to be paid until March 31st. On March 27th, therefore, the payment of two months dues—$6.50—would have precluded plaintiff's discharge. On that day, Brady tendered $10.50.

The Union rejected his tender on the grounds that $10.50 was "not sufficient to cover * * * dues *and* reinstatement fee". This certainly was sufficient to cover Brady's dues unless he was not entitled to rely on the clear provisions of the collective agreement. To be sure, it was hardly adequate to cover a $25 reinstatement fee, but that had not been demanded by the Union in its letter of March 13th.[28]

The next IAM demand was for the payment of $34.75 by April 4th to "cover past dues and reinstatement fee." Since the reinstatement fee was $25, the demand for $34.75 contemplated only a *three month* delinquency ($9.75) by *April 4th* even though the Union had previously been demanding *four months* dues by *March 28th.*[29] Indeed, on March 28th, the Union had flatly rejected a

---

28. Miller testified the March 13th letter was in error since it did not request a reinstatement fee. After he learned it had been sent to Brady, however, he told Coleman that if the four months dues requested were paid, it would be all right. Tr. 362. Since Brady had no knowledge of this conversation, its relevance after the fact is highly questionable.

Coleman's letter, moreover, written "as a result of instructions from Mr. Cliff Miller", rejected the tender of $10.50 on the grounds it was inadequate to cover "dues *and* reinstatement fee." Further, the Union constitution authorizes a reinstatement fee only after a three month delinquency. The agreement itself, while it mentions reinstatement fees, does not specify when they are to be imposed. Assuming the provisions of the Union constitution may be validly incorporated merely by such an oblique reference, they must still be read in conjunction with the explicit terms of the agreement, which is, after all, the governing document under 2 (Eleventh). Because the agreement does not require payment of dues, and thereby postpones a delinquency, until the last day of the following month, there was not a three month delinquency until March 31st. No other reading of

these documents is consistent with the policy underlying 2 (Eleventh) which is designed to give affected employees adequate notice of their union security obligations. See note 28 infra, and accompanying text.

29. Coleman explained his demand for $34.75 in the following way. It was his belief, he testified, that the December, January, and February dues still had to be paid but that the reinstatement fee took the place of March dues. He gave no indication whatsoever of the source of this belief.

All of the Union demands made upon Brady seem to have assumed that dues had to be paid by the first day of the month, i.e., December dues by December 1st, etc., that this is utterly inconsistent with the contract specification that "payment * * * [must be made] not later than the last day of the following calendar month. * * *" is too plain for argument. The contract, moreover, is the governing document, for 2 (Eleventh) validates union shop provision only when incorporated into an "agreement". Requirements inconsistent with the contract, whether in the Union constitution or in letters to Brady, can be of no effect.

tender more than adequate to cover three months. And since March 31st was a due date under the collective agreement, the demand for three months dues by April 4th is consistent solely with the proposition that only two months were due March 27th. The IAM, however, quickly abandoned the $34.75 demand, but not on the grounds that the amount of dues demanded was too little. The Union's final position was merely that payment of the reinstatement fee alone was adequate.

Defendants have argued that, in any event, the demands of the March 13th letter were not oppressive since at that point even more severe penalties, discharge or a reinstatement fee, could have been imposed. This contention, however, overlooks the fact that only past dues were demanded and these in an excessive amount. There is little reason why Brady or any employee in a similar position should be obligated to explore what other and more severe penalties could be imposed in order to determine whether compliance with an *ad hoc* demand of the Union is necessary. Since the letter of March 13th asked only for past dues, Brady had every right to calculate, under the terms of the agreement alone, the amount owed and to tender that sum. And, indeed, the Union's rejection of the tender, as reflected in the March 28th letter, was not based merely on an alleged insufficiency as to dues but on its failure "to cover * * * dues *and* reinstatement fee" (emphasis added).

It is the Court's view, therefore, that regardless of what other penalties might have been available to the Union on March 13th, its own requests were sufficient to justify Brady's tender of March 27th. But, in any event, no other penalties were available at that date. Discharge could occur only after compliance with the procedural requirements as to notice specified in the collective agreement. This had not been done on March 13th. Further, a reinstatement fee could not be imposed until there was a three month delinquency and that did not occur until March 31st.

■ All of this is perfectly consistent with Section 2 (Eleventh). That provision allows discharges otherwise violative of 2 (Fourth) only when a proper union security clause has been incorporated into an *agreement*. Plainly, one purpose underlying this requirement is to give adequate notice to affected employees of their union security obligations.[30] In short, employees need not resort to *ad hoc* correspondence from Union officers to determine their rights and duties. In the present case, however, the IAM's defense has been based almost exclusively upon letters sent to Brady which neither complied with the agreement nor were consistent with each other. There is no reason whatsoever why TWA and the IAM cannot incorporate clear union security provisions into their agreement which give adequate notice to the affected employees of the obligations imposed. Nor is there any reason why, having written such provisions into the agreements, they cannot apply them uniformly and comply with the requirements themselves. There is every reason why, however, they should not be allowed to discharge employees when they have failed to do these things. In the present case, the agreement is relatively clear, but IAM's rejection of Brady's March 27th tender did not comply with it and was utterly inconsistent with any obligations of which Brady had proper notice.

■ Because Brady's tender was sufficient to cover "the periodic dues * * * uniformly required * * *," the discharge is not protected by 2 (Eleventh). It is, therefore, violative of 2 (Fourth).

■ One problem remains: whether the IAM should be held jointly liable with

---

30. Arguably, this policy might prohibit incorporation of Union constitution provisions merely by reference. In this case, application of such a rule would bar imposition of a reinstatement fee. See note 27, supra. That is, however, unnecessary to decide.

TWA.[31] Section 2 (Fourth) prohibits carriers from exercising coercion. It says nothing express about unions. Section 2 (Eleventh), however, the exception to Section 2 (Fourth), uses the term "agreements". It was within Congress' contemplation that both the Union and the carrier would be signatory to the collective bargaining agreements. Since both parties were treated equally in Section 2 (Eleventh), and since Congress knew that the section was an exception to certain prohibitions, it is sound to conclude that Congress thought the Union might also be liable under Section 2 (Fourth) when it caused an illegal discharge.[32]

### III *Exhaustion of Intra-Union Remedies*

 IAM contends plaintiff may not bring this action because he failed to exhaust his intra-union remedies. But the only matter involved in this case is the legality of Brady's discharge under the Railway Labor Act, not the legality of the increase in dues or even IAM's rejection of his March 27th tender. After this decision, IAM is free to continue to reject Brady's dues, if it desires, so long as TWA does not discharge him. Brady, moreover, is seeking reinstatement in his job and neither the Union President, its executive council nor the National Convention can grant him that. Indeed, the most they can do is apologize. The available intra-union remedies are, therefore, not only inadequate but irrelevant.

 In any event, the doctrine of exhaustion of internal union remedies is entirely inapplicable in situations, as here, which do not involve internal union problems. Under the Railway Labor

Act, IAM is entirely free to reject Brady's tender of dues and even to expel him. It may do all of these things because they involve the union-member relationship and the Act leaves that untouched.[33] But when the Union strikes at the employment relationship and has an employee discharged, that is a different matter. At that point, it ceases to be a solely internal union problem, if for no other reason, because the employer is now involved. Nor is there anything whatsoever in the statutory language or legislative history supporting the IAM's contention. The Taft-Hartley analogy—which Congress explicitly had in mind when it drafted 2 (Eleventh)[34] —is again appropriate. No one has even suggested, much less held as a matter of law, that an employee illegally discharged under a union security agreement, must exhaust internal union remedies before applying to the National Labor Relations Board for relief under Section 8(a) (3). Policies, such as the exhaustion doctrine, designed to give private organizations principal responsibility for governing their internal affairs are, therefore, wholly inapposite in situations involving federal regulations of the employment relationship.

### IV

 The Court previously severed the trial of the liability issues from the damage questions. The nature of plaintiff's recovery still must be explored. For the guidance of the parties, plaintiff will be entitled to compensatory damages and reinstatement. The Court finds no barriers to this latter form of relief since it merely involves a mandatory injunction and that has been used in analogous situations by the Supreme Court.[35] Such

31. The TWA-IAM agreement contemplates that TWA might be found liable for illegal discharges under the union security agreement and provides that the IAM will indemnify it for losses incurred. PX 6, TWA-IAM Union Shop Agreement, Art. XXVI, para. (p).

32. The Taft-Hartley analogy may again be relevant, see note 19, supra, for under

29 U.S.C. § 158(b) (2), the Union would be liable in these circumstances.

33. Except, of course, where that relationship is such as to violate the "uniformity" requirement of 2 (Eleventh).

34. See note 19, supra.

35. See Virginian Railway Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

relief is also supported by the Taft-Hartley analogy[36] and seems necessary to effectuate the congressional policy fully.

The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.

---

36. Reinstatement is a common remedy under Taft-Hartley. 29 U.S.C. § 160(c). Even though the liability issue has been severed from damages, the availability of reinstatement has been dealt with at this stage because one contention of defendants has been that Brady's demand for reinstatement ousts the Court from jurisdiction.