**BROTHERHOOD OF RAILWAY, AIR-LINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, AFL-CIO**

v.

**PHILADELPHIA, BETHLEHEM & NEW ENGLAND RAILROAD COMPANY.**

Civ. A. No. 75–2634.

United States District Court, E. D. Pennsylvania.

March 23, 1977.

---

---

Solomon I. Hirsh, Stephen B. Horwitz, Rosemont, Ill., for plaintiff.

Norbert F. Bergholtz, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

This is an action by the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO (the Union), brought under the Railway Labor Act (the Act), 45 U.S.C. § 151 *et seq.* The defendant is the Philadelphia, Bethlehem & New England Railroad Company (the Railroad), a Pennsylvania corporation engaged in interstate railroad transportation and thus a "carrier" as defined by section 1 First of the Act, 45 U.S.C. § 151 First. The complaint alleges a violation by the Railroad of sections 2 Third and Fourth of the Act, 45 U.S.C. §§ 152 Third, Fourth, and jurisdiction is premised upon 28 U.S.C. § 1337.[1]

---

1. In a previously filed opinion of this court, defendants' motion to dismiss the complaint for lack of standing was denied. The court held that a *labor union* has standing to sue to en-force mandatory provisions of the Act even though those provisions may have as their primary purpose the protection of *employees'* rights of self-organization.

Presently before the court are defendants' motion to dismiss the complaint for lack of subject matter jurisdiction, defendants' motion to amend its answer in order to add a counterclaim, and cross motions by the parties for summary judgment.[2] For the reasons set forth below, defendants' motion for summary judgment will be granted, plaintiff's motion for summary judgment will be denied, and defendants' motion to amend its answer will also be denied.

## I.

It would be appropriate at this stage to briefly set forth the general allegations of the parties.

The complaint alleges that on or about June 17, 1975, a meeting and conversation took place between D. S. Reimer, the Railroad's Director of Labor Relations and Joseph F. Hause, an employee of the Railroad and a member of Lodge 1115, a local affiliate of the Union. The Union further alleges that the meeting and conversation were initiated by Mr. Reimer for the purpose of encouraging Mr. Hause to take steps which would lead to decertification of the Union as the exclusive collective bargaining representative of certain employees of the Railroad. In furtherance of this purpose, Mr. Reimer tendered to Mr. Hause authorization cards of the United Steelworkers of America (another Union) for distribution among the Railroad's employees represented by the Union.

The Union contends that Mr. Reimer's conduct as an agent and officer of the Railroad was in direct violation of sections 2 Third and Fourth of the Act, which provide in pertinent part:

Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided*, That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

**2.** The parties, by communication with the court, expressly waived any rights they may have had to a hearing on the cross motions for summary judgment. Fed.R.Civ.P. 56. *See Season-All Indus. Inc. v. Turkiye Sise Ve Fabrikalari, A.S.*, 425 F.2d 34, 39, 40 (3d Cir. 1970).

The Railroad denies that the conversation constitutes a violation of either section and seeks the protection of the proviso in section 2 Fourth which expressly permits conferral by employees with management during working hours.

The Union's prayer for relief seeks an injunction against further violations of the Act, punitive damages in the amount of $20,000.00, attorneys fees and costs, and an order that the Railroad post a notice at its place of business setting forth the rights of its employees under the Act to join and remain members of the Union and to assist the Union without any interference, influence, or coercion from the Railroad.

## II.

The Railroad initially moves to dismiss the complaint for lack of subject matter jurisdiction. The motion is premised upon the contention that the Union is suing pursuant to sections 2 Third and Fourth of the Act for which there is no express or implied private cause of action, and thus there would be no jurisdiction under 28 U.S.C. § 1337. It is clear from a mere reading of the Act that Congress provided no *express* private civil remedy for violation thereof. Whether a private cause of action in federal court is to be *implied* requires a brief discussion.

In *Texas & N.O.R.R. v. Brotherhood of Ry. and S.S. Clerks,* 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), the Supreme Court held that section 2 Third of the Act was fully and directly enforceable by the federal courts. In so doing, the Court stated:

> The definite prohibition which Congress inserted in the Act cannot therefore be overridden in the view that Congress intended it to be ignored. As the prohibi-

tion was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated.

281 U.S. at 569, 50 S.Ct. at 433. Section 2 Fourth was added to the Act four years after the *Texas & N.O.R.R.* decision, and in large part supplements and amplifies the section 2 Third prohibition against employer interference, influence or coercion with respect to employee self-organization or designation of a bargaining representative. *See Railway Employees Department v. Hanson,* 351 U.S. 225, 231, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *Brady v. Trans World Airlines, Inc.,* 223 F.Supp. 361, 365 (D.Del. 1963), *aff'd,* 401 F.2d 87 (3d Cir. 1968), *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969). Thus, subsequent to the time of the Supreme Court's pronouncement in *Texas & N.O.R.R., supra,* it could be said that both sections 2 Third and Fourth were directly enforceable in federal district court by way of a private civil action. However, in 1934, Congress amended the Act to increase the power and authority of the National Mediation Board [3] and at the same time to provide explicit penal sanctions for violations of section 2.[4] The Railroad argues that given this explicit increase in administrative authority to settle representational disputes and the explicit provisions for criminal liability, it is more likely as a matter of statutory construction that Congress removed the access to the federal courts via private civil actions expressly given in the *Texas & N.O.R.R.* case. This argument and its undergirdings, without more, are certainly persuasive. In fact, the argument that a private cause of action should not be implied under sections 2 Third and Fourth becomes almost compelling in light of recent Supreme Court and Third Circuit decisions addressing that general area of the law.[5] *Piper v. Chris-Craft In-*

---

**3.** The National Mediation Board was created by the 1934 Amendments to replace the old United States Board of Mediation. The NMB was given greater authority, particularly in representational disputes, and today is roughly analogous, though its power and authority are much more severely curtailed, to the National Labor Relations Board. *See Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.,* 406 F.Supp. 492, 496–98 (N.D.Cal.1976).

**4.** Section 2 Tenth of the Act, 45 U.S.C. § 152 Tenth, provides for criminal prosecution, imprisonment and fines for the willful failure to comply with, *inter alia,* sections 2 Third and Fourth of the Act.

**5.** Of particular significance is the fact that section 2 Tenth of the Act provides that it "shall be the duty of any United States attorney to whom any duly designated representative of a

*dus., Inc.,* —— U.S. ——, —— ——, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Cort v. Ash,* 422 U.S. 66, 77–85, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Rauch v. United Instruments, Inc.,* 548 F.2d 452 (3d Cir. 1976); *Wolf v. Trans World Airlines, Inc.,* 544 F.2d 134 (3d Cir. 1976).

■ Nevertheless, it appears that the Third Circuit has considered the question, although without benefit of the decisions cited directly above, and has held that a federal district court has subject matter jurisdiction under 28 U.S.C. § 1337 to entertain a private civil suit for violations of sections 2 Third and Fourth of the Act. *Brady v. Trans World Airlines, Inc.,* 401 F.2d 87 (3d Cir. 1968), *aff'g* 223 F.Supp. 361 (D.Del.1963), *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969). *Cf. Virginia Rwy. Co. v. System Federation No. 40,* 300 U.S. 515, 545, 57 S.Ct. 592, 81 L.Ed. 789 (1937). Though I question seriously whether, given the precise issue today, the Third Circuit would again so hold, I am bound by the precedent in *Brady, supra,* and therefore assume jurisdiction over this complaint.

Defendants' motion to dismiss the complaint is denied.

### III.

■ The parties have submitted to the court their respective motions for summary judgment pursuant to Fed.R.Civ.P. 56. It is unnecessary to discuss the familiar duties of the district court when faced with such motions other than to mention that the court's primary function is to determine whether any genuine issues of material fact exist and if there are no such issues, whether the moving party is entitled to judgment as a matter of law.

As set out above, the complaint is premised solely upon the contention that the meeting and conversation between Mr. Reimer of the Railroad and Mr. Hause of

the Union, violated the provisions of the Act which prohibit "interference, influence or coercion" by the Railroad with respect to the self-organization of employees or their designation or maintenance of a particular bargaining representative. In this vein, the guidelines and statements of the Supreme Court in *Texas & N.O.R.R.* will be borne in mind:

> The intent of Congress is clear with respect to the sort of conduct that is prohibited. "Interference" with freedom of action and "coercion" refer to well understood concepts of the law. The meaning of the word "influence" in this clause may be gathered from the context. *Noscitur a sociis.* [citation omitted] The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. "Influence" in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls "self-organization." The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this Act than in relation to well-known applications of the law with respect to fraud, duress and undue influence.

281 U.S. 568, 50 S.Ct. at 433. Also of some bearing is the Third Circuit's apparent position, as set forth in *Brady, supra,* that the intent standard of the analogous section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), is *not* to be read into section 2 Fourth. 401 F.2d at 100–01. With these rough legal perimeters in mind, I have carefully examined the record in full, particularly the depositions of Mr. Reimer and Mr. Hause, and am satisfied

---

[railroad's] employees may apply" to institute proceedings to enforce the provisions of Section 2 and to prosecute violations thereof.

This, arguably, would be the *exclusive* means by which employees or a union could redress employer violations.

that there exists no *genuine* issue of material fact.[6] It merely remains for the court to determine whether the meeting and conversation of June 17, 1975, rises to the level of the conduct prohibited by sections 2 Third and Fourth, as a matter of law.

The following account of the meeting and conversation which forms the basis for this lawsuit is, in my opinion, a recitation of undisputed fact as shown by the record.

There are approximately 50 employees of the Railroad who, at least as of June 17, 1975, were represented for collective bargaining purposes by the Union. (Deposition of D. S. Reimer, p. 15; Deposition of John F. Hause, p. 8). Mr. Hause was one of these employees. Prior to June 17, 1975, Mr. Hause had formed an attitude or feeling with respect to the quality of collective bargaining representation he was receiving from the Union, and that feeling was one of substantial discontent (Hause, pp. 8–12, 19, 30, 50). Mr. Reimer, who held the office of Director of Labor Relations for the Railroad, was generally aware of this discontent on Mr. Hause's, and other Union members' parts (Reimer, pp. 20–22, 24–26, 28, 31, 39–42, 43, 44, 57). More specifically, shortly before June 17, 1975, Mr. Reimer was informed by a Mr. Reiss, a crew clerk for the Railroad, that Mr. Hause had placed a motion before a general Union membership meeting seeking decertification of the Union (Reimer, pp. 31, 50). Mr. Reimer saw Mr. Hause very infrequently, as it was approximately 1½–2 miles from Mr. Reimer's office to the Shimersville Yard where Mr. Hause worked for the Railroad as a janitor (Reimer, p. 50; Hause, p. 50). On the afternoon of June 17, 1975, Mr. Reimer left his office and travelled to the Shimersville Yard for the sole purpose of speaking with Mr. Hause. This action on Mr. Reimer's part was a direct result of the information relayed to him by Mr. Reiss that Mr. Hause was dissatisfied with the representation by the Union (Reimer, pp. 50–51, 55–56). Mr. Hause was summoned from his second floor work quarters and descended the stairway in order to meet Mr. Reimer (Hause, p. 17). Initially, the two were engaged in some general conversation and then, at Mr. Hause's suggestion, they stepped outside the building (Reimer, p. 53; Hause, p. 18). At that point, Mr. Reimer stated that it was his understanding that Mr. Hause had put a motion on the floor at a Union meeting to take steps to decertify the Union and seek another collective bargaining representative (Reimer, p. 52; Hause, p. 18). Mr. Hause acknowledged that Mr. Reimer's understanding was essentially accurate (Reimer, p. 53; Hause, p. 19). Mr. Reimer thereupon volunteered a simple explanation of the procedure for decertification of a railway union, i. e., the procurement of signed authorization cards of at least 51% of the relevant employees followed by a petition addressed to the National Mediation Board (Reimer, p. 53; Hause, p. 19). Mr. Hause replied that he understood this, and at that point Mr. Reimer offered to give Mr. Hause the address of the National Mediation Board and also tendered to him a stack of authorization cards for the United Steelworkers of America Union[7] (Reimer, p. 53; Hause, p. 21). Mr. Reimer merely offered the cards to Mr. Hause and in fact suggested that if Mr. Hause so desired he could throw the cards away (Reimer, p. 53; Hause, p. 21). Mr. Hause took the cards from Mr. Reimer, and that concluded the meeting and conversation (Reimer, p. 54; Hause, p. 21). Mr. Hause returned to his work, and that evening while home, he telephoned an officer of the local chapter of the Union and described the conversation that had occurred that afternoon (Hause, p. 23).

---

6. Indeed, the mere fact that there are cross motions for summary judgment indicates that both parties believe the facts to be basically undisputed. Though I recognize the court's independent duty to ascertain from the record the nonexistence of disputed facts, the existence of cross motions is a weighty factor in doing so.

7. The authorization cards had been sent to Mr. Reimer in 1970 as a result of a meeting between members of the Union and the United Steelworkers of America representative, Mr. DeMarco (Reimer, pp. 36–37). Mr. Hause was one of the Union members present at this meeting (Hause, pp. 9–10).

The record reveals certain other undisputed facts material to this case. At no time did Mr. Hause ever show or present the authorization cards to other members of the Union in order to get their signatures (Hause, pp. 27–28). Nor did the conversation with Mr. Reimer cause Mr. Hause to attempt to convince other members to "get out" of the Union (Hause, pp. 26, 28). Although Mr. Hause at the time realized he was not compelled to talk to Mr. Reimer and had the freedom to leave at any time during the conversation, he also felt that due to Mr. Reimer's authority and position with the Railroad, he was obliged to stay nevertheless and hear Mr. Reimer out (Hause, pp. 29, 30, 34). Mr. Hause never requested the authorization cards and, in fact, never expressly stated to Mr. Reimer that he wanted to change bargaining representatives (Reimer, pp. 57, 58). On the other hand, Mr. Reimer never ordered Mr. Hause to do or not to do anything (Hause, p. 31), and in fact it was the intention of Mr. Reimer to merely assist and inform Mr. Hause in the event that Mr. Hause wished to initiate the necessary steps to change unions in light of his known frustration with the quality of the Union's representation efforts (Reimer, p. 57). Mr. Reimer never inquired of Mr. Hause what he had done with the authorization cards, and never engaged Mr. Hause in another conversation about the Union's representation (Hause, p. 37).

Finally, and most significantly, as Mr. Hause perceived the events of June 17, 1975, Mr. Reimer at no time threatened, harassed, pressured, or coerced Mr. Hause, nor did he abuse his authority or position with the Railroad except to the extent that Mr. Hause felt obliged to at least listen to what Mr. Reimer had to say (Hause, pp. 20, 21, 28, 29, 30, 31, 32–33, 35).

From time to time a court is faced with a legal question framed by a factual posture which falls within an area best described as a "twilight zone" in that it is neither clearly within nor clearly without the language of a relevant statute or rule of law. Such is the case here. Exhaustive research reveals that most if not all of the cases arising under sections 2 Third and Fourth of the Act involve extreme and egregious conduct on the part of a carrier, leaving little question as to whether the relevant provisions have been violated. Obviously these cases do not define the precise boundaries beyond which a railroad may not proceed in its collective bargaining relations with its employees.

■ Therefore, our inquiry must of necessity begin with the statutory language itself. In essence the Act makes it unlawful for the Railroad, through its agents and officers, "to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization." The Supreme Court, as set out above in the quotation from *Texas & N.O.R.R.*, has stated these terms constitute "well understood concepts of the law" and they are not to be misconstrued as interdicting *innocent* communications between employer and employee. The Court also indicated that the term "influence" as it appears in sections 2 Third and Fourth means pressure, the use of authority or power, or the abuse of relation or opportunity so as to corrupt or override the will. These standards, by themselves, when applied to the undisputed facts enumerated above, do not reveal, in my opinion, a violation of the Act. Mr. Hause, in his deposition, stated categorically that he was in no way, either expressly or impliedly, pressured, harassed, threatened, or induced to do or not to do any act. I am aware that under similar provisions of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), the test of coercion is not whether it is actually effective but rather whether it merely may reasonably tend to be so. *NLRB v. Clearfield Cheese Co.*, 322 F.2d 89 (3d Cir. 1963). Even assuming the same standard to be applicable under the Railway Labor Act, I cannot find the requisite impairment of employee self-organization rights. In my opinion, Mr. Reimer's voluntary explanation to Mr. Hause of the neces-

sary procedures for decertification of a union, without more, could never be viewed as a violation of the Act. The tender of the authorization cards, however, is really the heart of this lawsuit. The offering of union authorization cards to an employee who is currently represented by another union is certainly on its face an encouragement by the employer that bargaining representatives be changed. However, coercion and other lesser strains of influence must always be measured by the totality of the circumstances. Here, the authorization cards were merely offered to Mr. Hause and he was under no compulsion to take them; the tender of the cards was coupled with a statement by Mr. Reimer that Mr. Hause could do with the cards as he pleased and could even throw them away without consequence; the cards were offered at a time when Mr. Reimer was aware of Mr. Hause's substantial dissatisfaction with the incumbent Union and when both Mr. Reimer and Mr. Hause were aware that at a prior time members of the Union had discussed with a representative of the United Steelworkers of America switching to that union; and there was never any subsequent inquiry or "check-up" as to what Mr. Hause had done with the cards.

Keeping in mind all of the above, the events of June 17, 1975, would appear to be a single, isolated, casual incident which on its very specific facts does not amount to a violation of sections 2 Third and Fourth of the Act. This is not to condone or approve the issuance by a carrier to its employees of union authorization cards; the unique facts of this case place the Railroad's activities outside of the reach of the Act.

Defendant's motion for summary judgment is granted and judgment will be entered in its favor. Plaintiff's motion for summary judgment is denied.

### IV.

Defendant's motion to amend its answer in order to add a counterclaim, premised on the grounds offered by defendant, will be denied as being without merit.