**CSX TRANSPORTATION INC.,**
**Plaintiff–Appellant,**

v.

**Neil J. MARQUAR, Mac A. Fleming, F.N. Simpson, and Brotherhood of Maintenance of Way Employes, Defendants–Appellees.**

**No. 91–5689.**

United States Court of Appeals,
Sixth Circuit.

Argued March 27, 1992.

Decided Nov. 13, 1992.

Freddie B. Westfall, Jr., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., Ronald M. Johnson (argued and briefed), Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Nicholas S. Yovanovic, James D. Tomola, CSX Transp. Inc., Law Dept., Jacksonville, Fla.,

Adrienne A. Berry, Segal, Isenburg, Sales, Stewart & Cutler, Christophe G. Stewart, Louisville, Ky., William A. Bon (argued and briefed), Brotherhood of Maintenance of Way Employees, Southfield, Mich., for defendants-appellees.

Before: JONES, GUY, BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

Plaintiff CSX Transportation Inc. appeals the district court's decision granting a motion to dismiss for defendants, Brotherhood of Maintenance of Way Employes (BMWE or "the union") and several union members, on the grounds that a railroad cannot obtain monetary damages under the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188, for an illegal strike by the union. The majority affirms the district court and holds that monetary damages are never awardable under the RLA for a strike over a minor dispute. I, however, dissent from this holding.

I.

In September of 1990, CSX Transportation Inc. assigned part of a "stationary" track gang headquartered in Cynthiana, Ky., to perform track repairs away from its headquarters. CSX provided a truck driver to take lunch orders from gang members and bring their lunches to the job site. On September 19, 1990, defendant F.N. Simpson complained to CSX that CSX was violating the collective bargaining agreement by having these union members eat lunch on the job site instead of at the motel where the union members had been meeting each day. The union members contended that this was a "major dispute" under the RLA and that CSX was violating the RLA's status quo obligations under the RLA by changing a term of employment. CSX countered that this was a minor dispute.[1] When CSX continued to insist that it believed this to be a minor dispute, the General Chairman of BMWE, defendant Neil J. Marquar, threatened that the union would strike.

On September 20, 1990, CSX brought suit against the BMWE and union members Mac Fleming, Neil J. Marquar and F.N. Simpson for declaratory, injunctive and compensatory relief. On September 22, 1990, the union approved a strike over the lunch dispute. On September 24, 1990, at 5 a.m., the union began a nine-state strike against CSX. That same day, at 10:35 a.m., CSX obtained a temporary restraining order, enjoining the strike. The parties then agreed to submit the dispute to arbitration as required by the RLA, and the arbitration panel upheld CSX's view that this was a minor dispute. The dispute was resolved through this arbitration process.

CSX, however, continued this action for compensatory relief. In its amended complaint filed February 11, 1991, CSX claimed that despite the swift injunctive relief, the strike had disrupted its business and delayed its trains, and also had stalled shipments to the Persian Gulf War. On May 3, 1991, the district court granted BMWE's motion to dismiss, finding that no court had allowed damages in this situation and that Congress had failed to "affirmatively approve such remedies." On appeal, plaintiff-appellant CSX contends that damages should be available under the RLA because

---

**1.** The RLA requires that during a "major dispute" neither the railroad nor the union change the status quo by altering a term or condition of employment. 45 U.S.C. § 152, Seventh; § 152, First; § 156; § 160. The RLA also requires the parties to arbitrate all "minor disputes" and forbids strikes over minor disputes. *See supra* note 2 for a more detailed discussion of major and minor disputes.

the Supreme Court already has implied a right of action in this situation and a damages remedy is appropriate. Defendants-appellees argue that the Fifth Circuit's decisions in *Louisville & Nashville Railway Co. v. Brown*, 252 F.2d 149 (5th Cir.), *cert. denied*, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958), and in *Burlington Northern Railway Co. v. Brotherhood of Maintenance Way Employees*, 961 F.2d 86 (5th Cir.1992), which denied damages for an unlawful strike, are controlling and that a damages remedy would disturb the balance of power between labor and management.

## II.

In reviewing defendant's motion to dismiss, the standard of review that we must apply is that, "to be granted, there must be no set of facts which would entitle the plaintiff to recover. Matters outside the pleadings are not to be considered, and all well-pleaded facts must be taken as true." *Jackson v. Richards Medical Co.*, 961 F.2d 575, 577–78 (6th Cir.1992).

■ As the arbitration panel found and the district court recognized, this lunch controversy constitutes a minor dispute, and therefore defendants violated the RLA by striking over a minor dispute.[2] We must determine, then, whether under the RLA a railroad may obtain money damages in this situation.

The question of whether monetary damages are available under the RLA for an illegal strike is one of first impression for this Circuit, and only one other circuit has addressed this issue. *See Burlington Northern Ry. v. Brotherhood of Maintenance of Way Employees*, 961 F.2d 86, 88–89 (5th Cir.1992) (damages not available); *Louisville & N. Ry. v. Brown*, 252 F.2d 149, 155 (5th Cir.) (same), *cert. denied*, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958). We find that the recent Supreme Court opinion in *Franklin v. Gwinnett County Public Schools*, — U.S. —, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), provides the framework that must govern our approach in deciding this question. Although *Franklin* does not change the existing law of implied rights and the remedies available under a statute providing those rights, it does clarify the route courts are to take in

---

2. Although the "major dispute"/"minor dispute" terminology is not used in the language of the RLA, the Supreme Court first made this distinction in *Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). "Minor disputes" are controversies over the meaning or application of an existing collective bargaining agreement or employment practice in a particular fact situation. *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R.*, 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957); 45 U.S.C. § 152, Sixth. If the parties cannot resolve minor disputes on their own, they are submitted to the National Railroad Adjustment Board for final resolution. 45 U.S.C. § 153, First (i) & (m). The Board has exclusive jurisdiction over minor disputes, and a party cannot bypass the Board and take the dispute into federal court, except to enforce the Board's award. *McKinney v. International Ass'n of Machinists & Aerospace Workers*, 624 F.2d 745, 748 (6th Cir.1980). If this Board cannot resolve the dispute, it goes to a referee. 45 U.S.C. § 153, First (*l*). The RLA forbids strikes over minor disputes. *Chicago River & Ind. R.R.*, 353 U.S. at 34, 77 S.Ct. at 637.

In contrast, "major disputes" result from a disagreement in the bargaining process for a new contract or over a change in a term of an existing contract for pay, rules and working conditions. 45 U.S.C. § 152, Seventh. When a major dispute arises, neither party can alter the status quo by striking or altering pay, rules or working conditions until the parties have exhausted the negotiation and arbitration procedures set up by the RLA. *Id.* § 152, Seventh; § 155, First; § 156; § 160. These procedures include giving notice of the proposed change in pay, rules, or working conditions, 45 U.S.C. § 156; conferring about the change, *id.* § 152, Second; seeking conciliation services from the National Mediation Board, *id.* § 155; agreeing, if possible, to submit the dispute to arbitration, *id.* § 155, First; § 157; and having the President call together an emergency board to investigate whether the dispute threatens to interrupt service, *id.* § 160. If all of these negotiation steps fail, unions then may strike and management can alter the status quo. *See Detroit & T.S.L.R. v. United Transp. Union*, 396 U.S. 142, 150–53, 90 S.Ct. 294, 299–300, 24 L.Ed.2d 325 (1969), *limited on other gds.*, *Pittsburgh & L.E. R.R. Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). Further, it has been held that if the railroad violates the status quo during a major dispute by altering the pay, rules or working conditions, the union may strike immediately before exhausting the conciliation steps. *See Detroit & T.S.L.R.*, 396 U.S. at 154, 90 S.Ct. at 301.

determining whether particular remedies are available under a federal statute. *Id.* at ——, 112 S.Ct. at 1032–38.[3]

In *Franklin,* the Court addressed whether an implied right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, supports a claim for money damages. The Court held that money damages are available under Title IX, and it indicated that once a right has been implied under a statute, courts need only decide what remedies are available under that statute. *Id.* at ——, 112 S.Ct. at 1032. The Court then held:

> As we have often stated, the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place. *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2274 [60 L.Ed.2d 846] (1979). Thus, although we examine the text and history of a statute to determine whether Congress intended to create a right of action, *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489 [61 L.Ed.2d 82] (1979), we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. *Davis,* supra 442 U.S., at 246–47, 99 S.Ct. at 2277–2278. This principle has deep roots in our jurisprudence.

*Id.* The *Franklin* Court relied on *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946), in which the Supreme Court held that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* The *Franklin* Court then proceeded to discuss the historical basis, dating back to *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), for the "longstanding rule" that "where there is a legal right, there is also a legal remedy." *Franklin,* —— U.S. at ——, 112 S.Ct. at 1033 (citing *Texas & N.O.R. v. Brotherhood of Railway & S.S Clerks,* 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930); *Texas & P. Ry. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916); *Dooley v. United States,* 182 U.S. 222, 229, 21 S.Ct. 762, 765, 45 L.Ed. 1074 (1901); and *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 624, 9 L.Ed. 1181 (1838)). This presumption of the availability of all appropriate remedies has not dissipated in recent Supreme Court cases, the *Franklin* Court noted. *See Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630 n. 9, 104 S.Ct. 1248, 1252 n. 9, 79 L.Ed.2d 568 (1984) (retroactive relief available to plaintiffs); *Davis v. Passman,* 442 U.S. 228, 247 n. 26, 99 S.Ct. 2264, 2278 n. 26, 60 L.Ed.2d 846 (1979) (federal court may order any appropriate relief); *Cary v. Piphus,* 435 U.S. 247, 255, 98 S.Ct. 1042, 1048, 55 L.Ed.2d 252 (1978) (damages under § 1983); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969) (statutory right "implies the existence of all necessary and appropriate remedies"); and *J.I. Case Co. v. Borak,* 377 U.S. 426, 433–35, 84 S.Ct. 1555, 1560–61, 12 L.Ed.2d 423 (1964) (courts have power to grant "all necessary remedial relief"). The *Franklin* Court then stated, in sweeping terms clearly applicable to any federal statute, that "[t]he general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* —— U.S. at ——, 112 S.Ct. at 1035.

### A.

Applying the *Franklin* framework to

---

**3.** Before *Franklin,* the Supreme Court and other courts at times have blurred the distinction between a "right" and a "remedy" and have used the terms interchangeably. *See, e.g., Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). The Court acknowledged as much in *Franklin,* when it noted: "[T]he Court has recognized the power of the judiciary to award appropriate remedies to redress injuries actionable in federal court, although it did not always distinguish clearly between a right to bring suit and a remedy available under such a right." *Franklin,* —— U.S. at ——, 112 S.Ct. at 1032.

this case,[4] we first note that the RLA does not provide explicitly for a right of action when a union strikes over a minor dispute, and in fact it does not explicitly provide for any causes of action.[5] However, the Supreme Court has implied a right of action under the RLA for a union's illegal strike. In *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957) [hereinafter *Chicago River*], the Court implied a cause of action under the RLA and held that an injunction was appropriate to prevent an illegal strike. In that case, the union struck against the railroad over a number of grievances involving compensation. The Court held that this was a minor dispute and that the union was bound by the "unequivocal" language in the RLA not to strike but instead to use the arbitration procedures set out in the Act. *Id.* at 34, 77 S.Ct. at 637. The *Chicago River* Court then held that "the federal courts can compel compliance with the provisions of the Act to the extent of enjoining a union from striking to defeat the jurisdic-

tion of the Adjustment Board." *Id.* at 39, 77 S.Ct. at 640. The Court focused on why the Norris LaGuardia Act did not prohibit injunctions under the RLA and concluded that the district court " 'has jurisdiction and power to issue necessary injunctive orders [to enforce compliance with the requirements of the Railway Labor Act] notwithstanding the provisions of the Norris–LaGuardia Act.' " *Id.* at 42, 77 S.Ct. at 641 (quoting *Brotherhood of R.R. Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952)).[6] This implied right of action created in *Chicago River* exists under the RLA although the statute is silent as to any such right.

According to *Franklin,* because the Supreme Court has already implied a right of action under the RLA where the union conducts or threatens an illegal strike, we need not undertake an analysis, using the line of Supreme Court cases discussing implied rights,[7] of whether to imply a right of action in this situation before addressing the issue of damages.[8] Rather, because an

---

4. We do not accept appellees' argument that *Franklin's* reasoning is applicable only to civil rights statutes. The initial discussion of rights and remedies in *Franklin* uses broad language to set out general principles governing the availability of particular remedies under any federal statute. It does not restrict itself to a discussion of Title IX and other civil rights statutes. This is clear from the fact that *Franklin* discusses a long line of cases in which the Court found a remedy where there was a right, including cases such as *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), which did not involve civil rights. *See Franklin,* —— U.S. at ——, 112 S.Ct. at 1033.

5. The only right or remedy set out in the RLA is a criminal prosecution section. 45 U.S.C. § 152, Tenth. As noted in the subsequent discussion of the RLA's legislative history, the legislative history indicates that this absence of remedies was intentional because Congress intended the courts to fashion remedies to enforce the RLA. 1 *The Railway Labor Act of 1926—A Legislative History,* at 235, 282–84 (1988).

6. The Supreme Court has also authorized injunctions under the RLA in other contexts. *See, e.g., Texas & N.O.R. v. Brotherhood of Ry. & S.S. Clerks,* 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930) (injunction appropriate for interference with employees' organizational rights: "As the prohibition was appropriate to the aim of Congress, and is capable of enforce-

ment, the conclusion must be that enforcement was contemplated.")

7. In a series of cases, the Supreme Court has discussed implied rights of action and the remedies available under those rights. *See Texas & P. Ry. v. Rigsby,* 241 U.S. 33, 38, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (setting out expansive test for implying rights); *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1974) (limiting test for implying rights); *Merrill, Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 378, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982) (refining *Cort* by focusing on congressional intent); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 23–24, 100 S.Ct. 242, 246, 249, 62 L.Ed.2d 146 (1979) (restricting rights-creating approach applied in the earlier cases). *See also Franklin,* —— U.S. at ——, 112 S.Ct. at 1039 (Scalia, J., concurring), and *Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 524, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) (arguing that the Court in effect has overruled *Cort v. Ash* with *Touche Ross* and *Transamerica* cases).

8. In *Kaschak v. Consolidated Rail Corp.,* 707 F.2d 902 (6th Cir.1983), a panel of this Court addressed whether a right existed under the RLA permitting damages in the context of a minor dispute over a wrongful discharge.

implied cause of action already exists under the RLA in this situation, *Franklin* dictates that we presume that all "appropriate" remedies are available "unless Congress has expressly indicated otherwise." *Franklin*, — U.S. at —, 112 S.Ct. at 1032.

### B.

In determining whether Congress has expressly intended to limit the presumption that all appropriate remedies are available under the RLA, *Franklin* instructs that ordinarily it is futile to resort to the traditional statutory interpretation tools of examining the text and legislative history of a statute because Congress usually has not spoken about remedies under a right that the Supreme Court, rather than Congress, created. *Franklin*, — U.S. at —, 112 S.Ct. at 1035 ("usual recourse to statutory text and legislative history ... will not enlighten our analysis"). Instead, *Franklin* mandates that we "evaluate the state of the law when the legislature passed [the RLA]" to determine whether Congress intended to limit the presumption in favor of all appropriate relief. *Franklin*, — U.S. at —, 112 S.Ct. at 1036.

At the time of the RLA's enactment in 1926, the Supreme Court "regarded the denial of a remedy as the exception rather than the rule." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 375, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982) (noting that the broad approach laid out in *Texas & Pacific Railway v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), prevailed up to the 1975 decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). It was in this context that Congress passed the RLA without stating any intent to abandon the traditional presumption in favor of all available remedies. *See Franklin*, — U.S. at —, 112 S.Ct. at 1036 (noting context in which Congress passed Title IX). Even after the Supreme Court created an implied right of action under the RLA in *Chicago River*, 353 U.S. at 42, 77 S.Ct. at 641, Congress, although aware of this decision, amended the RLA in 1966 and made additional changes in 1970, but never indicated that any particular remedy was not appropriate to compensate for a strike over a minor dispute. Pub.L. No. 89–456, §§ 1, 2, 80 Stat. 208, 209 (1966); Pub.L. No. 91–234, §§ 1–6, 84 Stat. 199, 200 (1970).[9] There-

There, we did not focus on the distinction between rights and remedies but implied that once a right has been created, the only issue is whether a particular remedy is an appropriate means for enforcing the right. *Kaschak* held:

> We do not feel, however, that a remedy need be implied in this case; the unique nature of the RLA relieves us from having to go that far. As noted, the RLA is quasi-contractual in nature, creating legally enforceable obligations enforceable by whatever means appropriate. Our inquiry regarding Board jurisdiction only requires that we ask to what extent the statute itself has defined the appropriate means for enforcing a limited class of these obligations. The only question under the RLA is *where* an existing remedy may be enforced.

*Id.* at 909 n. 13.

This language makes clear that in *Kaschak* we found that the quasi-contractual nature of the RLA made it unnecessary to imply a right in that situation. We found the RLA to be quasi-contractual because the statute arose from an agreement between labor and management that Congress and the President later ratified. Although *Kaschak's* quasi-contract analysis may provide another reason why we need not imply a cause of action for an illegal strike, here we

do not need to base an implied cause of action for an illegal strike on quasi-contract principles because the Supreme Court already has explicitly created a cause of action in this situation in *Chicago River*, 353 U.S. at 42, 77 S.Ct. at 641.

9. Defendants–Appellees argue that when amending the RLA, Congress had the opportunity to permit damages, but "specifically declined to create such a cause of action." Appellees' Brief at 34. However, *Franklin* makes clear that silence is not enough to preclude a remedy under an implied cause of action. Instead, Congress must expressly state that damages are not permitted. *Franklin*, — U.S. at —, 112 S.Ct. at 1035. Congress has not done so.

Defendants–Appellees also argue that the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 185 & 187, permits monetary damages for unlawful strikes, but specifically exempts the RLA from application of these provisions. Appellees' Brief at 34. Section 182 states:

> The provisions of this subdivision shall not be applicable with respect to any matter which is subject to the provisions of the Railway Labor Act, as amended from time to time.

29 U.S.C. § 182. While this provision clearly states that the damages provision of the LMRA does not apply to the RLA, this passage cannot

fore, it is clear that Congress made no attempt to alter the traditional presumption in favor of permitting all appropriate relief to remedy a violation of this federal right under the RLA. Thus, we must presume that all appropriate remedies are available, and accordingly we have the power to enforce the RLA through "whatever appropriate means might be developed." *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971).

### C.

As noted above, the Supreme Court pointed out in *Franklin* that legislative history ordinarily is not helpful in determining what remedies are available under a federal statute from which the courts already have implied a right of action. However, this is not the usual case where because the statute itself "supported no express right of action, it is hardly surprising that Congress also said nothing about the applicable remedies for an implied right of action." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1038. Instead, the RLA presents a case in which the legislative history speaks directly to Congress's intent that this statute create rights for which the courts would fashion a whole spectrum of remedies. The RLA's legislative history reveals

that the right "implied" by the Supreme Court in *Chicago River* to resort to the courts in the event of illegal strikes clearly was contemplated by Congress when it enacted the RLA. In fact, the legislative history indicates that Congress deliberately did not include in the RLA's provisions any enforcement mechanisms or remedies, intending instead that the courts would develop the law as to its enforcement with all available remedies. Thus, although ordinarily we must presume that Congress intended the full range of remedies once the courts imply a right, *Franklin*, —— U.S. at ——, 112 S.Ct. at 1035, here we need not rely only on presumptions because we have clear evidence that Congress intended to create such a right of action and that it intended the courts to enforce it with all available remedies. The RLA, therefore, presents the very strongest case for finding that a full range of remedies is available.[10]

It is clear from the legislative history that Congress did not intend to fashion any remedies in the RLA itself, but instead intended that the courts would decide what remedies were necessary to enforce the RLA. *See* 1–4 *The Railway Labor Act—A Legislative History* (1988) [hereinafter *Legislative History*].[11] In answering how

---

be used to show by negative implication that Congress expressly indicated that no monetary damages are available under the RLA.

**10.** Justice Scalia, in his concurring opinion in *Franklin*, criticized the approach taken by the majority in that case, noting, "[W]hat the Court's analytical construct comes down to is this: Unless Congress expressly legislates a more limited remedial policy with respect to rights of action it does not know it is creating, it intends the full gamut of remedies to be applied." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1039.

We believe that the RLA, however, presents the very case to which Justice Scalia's sensible observation does not apply. In enacting the RLA, Congress intended that although it had declined to expressly create rights of action under the statute, the courts could, and should, fashion the full gamut of remedies. We note as well that this case is not one in which resort to legislative history is had to "interpret" that which is clear and unambiguous in the language of the statute itself. A study of the legislative history of the RLA, and particularly of the floor debates surrounding its adoption, reveals that

Congress, by design, left to the courts the development of the law of enforcement of the statute, both as to the rights of action created under the statute and the remedies for violations of those rights. That being the case, we are required to review that history carefully to determine the breadth of remedies available to vindicate the right which the Supreme Court has already implied under the statute.

**11.** Mr. Richberg, attorney for the labor organizations, stated:

We have avoided in the bill in any way of getting up any penalty sections or any sections for the invocation of any judicial authority except in the enforcement of an arbitration award, the thought being this, that so far as this law stated duties imposed upon the parties by act of Congress, if they failed to live up to their duties, and there was any action which a court could take, consistent with the judicial powers and its limitations, to compel the enforcement of that duty as a legal obligation, it would be subject to enforcement. But the law for such enforcement or compulsions should be developed in the courts, ac-

the RLA was to be enforced, Representative Newton of Minnesota responded:

> [I]t is our understanding from the hearings that the parties have agreed in the main upon a procedure whereby these boards will be established. Now, then, if one party to the dispute shows no inclination whatever to carry out the terms and provisions of this act there is a violation of a very important legal obligation that is laid down in the law, and that is enforcible [sic] in the courts.

*Legislative History, supra,* at 282–83. The dialogue continued:

> MR. NEWTON of Minnesota: ... That is, there is no compulsion to do or not to do specific acts; but there are imposed upon the parties, in the interests of the public and the maintenance of uninterrupted service, certain duties. The violation by either party of these duties would call for appropriate action in the courts of law and equity by the aggrieved party or the public.
>
> MR. SPROUL of Kansas: In what way? Where is there any such provision?

MR. NEWTON of Minnesota: Through the theory of the common law. The duties are laid down. The law for enforcement would be developed in the courts after the obligations are made and understood.

.    .    .    .    .

> MR. GARRETT of Tennessee: ... Does the gentleman mean that the matter to which we have just been referring can be enforced now by mandatory injunction?
>
> MR. NEWTON of Minnesota: I mean that there are obligations imposed by this bill upon both carrier and employee; that these obligations can be enforced in the law and equity courts just the same as other obligations and duties are enforceable in those courts....

*Legislative History, supra,* at 283 (House Debate, February 24, 1926).[12] The legislative history also indicates that the parties intended for the anti-strike and anti-lockout provisions of the RLA to be reciprocal obligations,[13] and therefore presumably en-

---

[12] *See also Legislative History, supra,* at 284, discussing the availability of damages in court when a party violates an award or agreement reached through the RLA's conciliatory and arbitration provisions:

> cording to the old common-law theory of letting the courts develop the law after the obligations are clearly understood, rather than to write into the law a specific line of penalties and writs of enforcement.
>
> ....
>
> I think if either party showed a willful disregard of the fundamental requirements, that they should make every reasonable effort to make an agreement—in other words, if they refuse absolutely to confer, to meet or discuss or negotiate I think there is a question as to whether there might not be invoked some judicial compulsion, but I would rather see that left to development rather than see it written into the law.
>
> *Legislative History, supra,* at 283–84.

MR. LAGUARDIA: According to the gentleman, after an agreement has been reached and made a part of the record, then either party may resort to law for damages for violation or to equity for specific performance?
MR. NEWTON of Minnesota: Exactly. They may resort to any remedy open in the courts of law or equity.

.    .    .    .    .

MR. LAGUARDIA: I mean after an agreement has been entered into and made a record of the court as is provided in this bill. Then if there is any disobedience or noncompliance with the provisions of that agreement, the gentleman means to say that the railroad may go into a court of equity and require specific performance?
MR. NEWTON of Minnesota: I have not given thought to that particular provision about specific performance but every legal right that inures in the common law could be made use of here to enforce these specific obligations that are laid upon the parties.... If he [the aggrieved party] failed there is not any question but that there would be open to the aggrieved party whatever right there might exist under the principles of law and equity for a violation of the agreement.

[13]

> Now, I have said very clearly, and I want to repeat it, that I have no question but that this imposes the obligation not to carry on any strike movement, not to call a strike—that is, not to have the men suspend work and imposes upon the employer precisely the same obligation that he shall not begin picking off men and discharging them in order to disintegrate the forces; and I think those are equally balanced obligations.

*Legislative History, supra,* at 292 (quoting Mr. Richberg, attorney for the unions, House hearings, at 276–77).

forceable by both parties. Although the congressional debate included a discussion of other remedies available for strikes, including contempt [14] and injunctions,[15] it also indicated that damages would be available to an aggrieved party, at least in the case of the union striking over a dispute after an agreement or award had been reached through the RLA's conciliatory provisions or striking over a major dispute before the RLA's provisions have been exhausted.

> MR. WHEELER: They have simply said in so many words, practically, that after the 60 days provided, if they violate any of the provisions, the roads can go into court and get an injunction against them. They have offered to have any award of this board entered as a judgment in the courts of the country, and if they violate the provisions of the award, under the decisions of the Supreme Court the roads can sue them in damages.

*Legislative History, supra,* at 549–50. Later Senator Wheeler commented:

> [I]n the event that a strike is threatened or a dispute arises under this bill, the men agree not to go on a strike for 60 days, while the whole question is being thrashed out in its different stages; and if they attempt to go on a strike, if the men should violate the law in any respect, then the railroads and the Government would have the right to go into court and get out an injunction to prevent them from going ahead with the strike. If the men violate the provisions of this law, the railroads or the Government can go in and sue the unions for a violation of their contracts and take away from them the money that they have saved in their treasuries. Not only that, but after they have finally come to

an agreement it is made binding upon the parties by making it a court record.

*Id.* at 559.

■ Thus, the legislative history indicating Congress's intent that the courts would enforce the RLA with all available remedies, as well as the *Franklin* presumption of the full range of remedies, indicate that we have the power to enforce the RLA with any appropriate remedy. We note that the right of action implied by the Supreme Court in *Chicago River* was to enforce compliance with the RLA. That right of action is not merely for the specific remedy provided in that case—injunctive relief—but a general right of action that can be enforced with any appropriate remedy.

### III.

The only question, then, is whether a damages remedy is appropriate to compensate a railroad for a union's illegal strike over a minor dispute. The district court disposed of this case on a motion to dismiss because it believed that damages can never be appropriate in such a situation. Accordingly, the district court did not examine the particular facts surrounding this case. The majority affirms this result. I, however, would reverse the district court's granting of the motion to dismiss for the reasons outlined below. I would hold that there may be circumstances in which a railway could recover damages from a union for an illegal strike over a minor dispute. Because the appropriateness of a remedy must be determined on a case-by-case basis, I would remand the case to the district court to deny the motion to dismiss and to permit discovery and the factual development necessary to permit the district court

---

**14.**

> MR. CUMMINS: ... But I think the judgment might very well be one which would restrain a conspiracy in the nature of a concerted abandonment of employment that would suspend or interfere substantially with transportation.
>
> MR. REED of Pennsylvania: In other words, a strike would be a contempt of court?
>
> MR. CUMMINS: It might be. That is to say, I think that under this bill there could be a

judgment rendered upon an award which would make a strike a contempt of court. *Legislative History, supra,* at 526.

**15.**

> MR. WHEELER: ... [I]n this bill labor has conceded practically, and in my judgment absolutely, the power of the Government to go into court and use the injunction in labor disputes.

*Legislative History, supra,* at 560.

to determine whether damages are appropriate in this case.

## A.

A brief overview of the RLA is useful in examining the appropriateness of a damages remedy for an unlawful strike. The RLA was passed in 1926 as a joint effort of labor and management that was ratified by Congress and the President. *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 576, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971). The RLA was the result of "prolonged conferences between representative Committees of railroad presidents and of executives of railroad labor organizations, and embodied an agreement of a large majority of both." *Texas & N.O.R. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 563, 50 S.Ct. 427, 431, 74 L.Ed. 1034 (1930) (private right and remedy of injunction available to prevent interference with organizational rights). Representative Denison stated during the House debate prior to the RLA's enactment:

> The railroads and their employees were invited by the President to reach an agreement. They have compromised their differences and have presented their agreement to Congress, and we are asked to examine it and either approve it or reject it.

*Legislative History, supra*, at 312.[16] Later, Representative Robinson of Kentucky stated: "The purpose of this act is to ratify and put the stamp of approval of Congress on the agreement entered into between the railroads and their workers to insure peace in this great industry and uninterrupted operation of the railroads." *Id.* at 384. In 1936, the RLA was amended to cover "common carrier[s] by air engaged in interstate or foreign commerce" and "carrier[s] by air transporting mail for or under contract with the United States Government." 45 U.S.C. § 181.

The RLA has five stated purposes:

(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein;

(2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization;

(3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter;

(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions;

(5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a. The Supreme Court, however, has held that Section 2, First, 45 U.S.C. § 152, First, is "the heart" of the RLA. *Chicago & N.W. Ry.*, 402 U.S. at 574, 91 S.Ct. at 1734. That section obliges the parties "to exert every reasonable effort to make and maintain agreements concerning rate of pay, rules, and working conditions and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." *Id.;* 45 U.S.C. § 152, First. The importance of

---

**16.** Both sides believed that they had compromised to form the contract that would become the RLA. "The railroad employees are giving up more under this bill than they have ever given up before in the history of the country." *Legislative History, supra*, at 538 (Senator Wheeler). Senator Wheeler later noted: "The executives of the railroad organizations ... have gone further in this bill in giving away the rights to which they are entitled under the Constitution than any other labor organization in this country has ever done ..." *Id.* at 550. And, Senator Cummins stated:

> Both railway executives and railway employees have pledged themselves, so far as men can be pledged under such circumstances, to a due observance of the provisions of the pending bill. It is the child of their joint negotiations, consultations, and deliberations. It has not been imposed upon them ab extra. It is to a very considerable degree, though perhaps not altogether, the offspring of their own unbegrudging volition.

*Id.* at 700.

preventing interruptions in service was emphasized in the congressional debate preceding the enactment of the RLA. For example, Mr. Newton commented:

> In this situation the parties have been unable to agree. They are in disagreement, but under this plan which has been agreed to they agree to maintain the status quo. And, gentlemen of the House, this will give the public more rights and will do more to enable them to maintain continuous, uninterrupted transportation upon a disagreement and deadlock than any other provision that has been written into law.

*Legislative History, supra*, at 291.[17] Although the RLA seeks to benefit the public by providing uninterrupted service, Congress also intended that both the railroads and the unions be beneficiaries of the Act. This is clear from the RLA's language, which states that the Act is intended to avoid "any interruption to commerce *or* to the operation of any carrier ..." and to guarantee "freedom of association" to employees and "complete independence" as to self-organization for carriers and employees. 45 U.S.C. § 151a (emphasis added). *See also* 45 U.S.C. § 152, First (duty designed to avoid interruption to "commerce or to the operation of any carrier ...").

As noted earlier, the RLA seeks to avoid interruption of service by requiring that all "minor disputes"[18] over interpretations of

the bargaining agreement first be submitted to the parties' grievance process and, if that does not resolve the matter, then be submitted to a Board of Adjustment.[19] Strikes over minor disputes are prohibited under the RLA. *Chicago River*, 353 U.S. at 34, 77 S.Ct. at 637.

### B.

It is important to examine the nature of the claim that CSX asserts here. CSX does not merely seek damages for a minor dispute, but instead seeks damages resulting from the union's unlawful strike over a minor dispute. In fact, the lunch dispute itself was later submitted to arbitration and resolved there as required by the RLA. CSX's claim, then, cannot be equated with an attempt to bypass the RLA's arbitration procedures and take a minor dispute into federal court in order to get relief not available in the arbitration process. Such an attempt to bypass the RLA's procedures clearly would be impermissible. *McKinney v. International Ass'n of Machinists & Aerospace Workers*, 624 F.2d 745, 748 (6th Cir.1980) (Board has exclusive jurisdiction over minor disputes).

Neither are the circumstances surrounding the CSX claim analogous to the circumstances in *Kaschak v. Consolidated Rail Corp.*, 707 F.2d 902, 906 (6th Cir.1983), where a panel of this Court indicated that

17. In the Senate debate, Senator Wheeler stated:
[T]he people of the country have been crying for the last 15 years for arbitration and wanting the railroads and their employees to get together. That is what we have been trying to do. We have been trying to avoid strikes and have them get together and settle their differences.
*Legislative History, supra*, at 538. Later in the debate, Senator Fess commented: "But this Nation could not exist if transportation stopped, for people would starve and freeze. Transportation is absolutely essential, and for that reason the public has a paramount interest in it and all of our legislation must reflect that particular item." *Id.* at 564.

18. See *supra* note 2 for a discussion of major and minor disputes.

19. The RLA's text reads:
All disputes between a carrier or carriers and its or their employees shall be considered,

and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.
45 U.S.C. § 152, Second.
The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.
45 U.S.C. § 153, First (i).

the arbitration procedures could be bypassed in favor of the federal courts "where the [arbitration] requirement would prevent the fashioning of an adequate remedy." *Id.* at 906–07 (citing *Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970)). In *Kaschak,* plaintiff tried to comply with the RLA's conciliation procedures by filing a grievance with the union after he was discharged by his employer, Conrail. The union, however, failed to process the grievance within the time limits of the bargaining agreement, and thus the grievance could not be reviewed by the Board of Adjustment. *Kaschak,* 707 F.2d at 903. Plaintiff then filed suit against his employer in federal court. The *Kaschak* Court held that plaintiff's grievance could be reviewed in federal court because the grievance was untimely and resort to the Board of Adjustment would have been futile:

> While there is no doubt that an employee may not opt to have his minor dispute resolved before a court rather than the Board, that is *not* the situation which Kaschak's claim presents to this court. Kaschak contends that he never had the chance to choose between the Board and the district court. Rather, he claims that he requested the Union to present his grievance to the Board and that the time for individual resort to the Board passed while he was relying on the Union to represent him.

*Id.* at 908. The *Kaschak* court, then, permitted the plaintiff to come to federal court despite the RLA's conciliatory provisions only because the union, one of the players under the RLA scheme, frustrated the RLA's process so that it could not have worked for this plaintiff.

In contrast, the claim that CSX makes here is not the kind of claim which could be heard by Adjustment Board arbitrators. That Board is only charged with handling minor disputes by interpreting collective bargaining agreements and making awards, not with enforcing the RLA's provisions. *Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 156 (7th Cir.1990) (arbitrators' task is only contractual interpretation), *cert. de-*

*nied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). A claim of damages to remedy an illegal strike would not bypass the conciliation methods for minor disputes set up by the RLA. Instead, CSX's claim arises from the union's intentional refusal to follow the RLA's mandate to submit minor disputes to arbitration, with the result that CSX was put in the position of having no recourse against the strike unless it could bring an action in federal court. Therefore, because the RLA's arbitration procedures were not designed to provide a remedy for damages resulting from a union's illegal strike, the RLA's goals cannot be vindicated unless judicial remedies are provided. *See United Indus. Workers of Seafarers Int'l Union v. Board of Trustees of Galveston Wharves,* 400 F.2d 320, 327 (5th Cir.1968) (Board had no jurisdiction because "a minor dispute is not involved. This is not a grievance, nor a matter of interpretation or application of a collective bargaining agreement."), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969) [hereinafter *Galveston Wharves.*] In this situation, where the Board of Adjustment can neither prevent nor compensate for the damage caused by an illegal strike, the RLA's anti-strike provisions can only be enforced through the federal courts. *See Steele v. Louisville & N.R.,* 323 U.S. 192, 207, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944).

### C.

The appropriate means of enforcing a right under the RLA must be determined on a case-by-case basis. In *Kaschak,* 707 F.2d at 906, a panel of this Court noted:

> The Supreme Court has repeatedly addressed the issue and determined that the provisions of the RLA are more than mere exhortations to the parties, creating legal obligations enforceable by whatever means appropriate ...

The question remaining is which are the appropriate means for the enforcement of the obligations which have been created between Conrail, the Union and Kaschak. Generally, the propriety of the

means of enforcement is to be determined on a case-by-case basis. *Id.* at 906 (citations omitted). In light of *Kaschak's* reasoning, I would not hold, as the majority does, that there can be no case in which a damages remedy is both appropriate and necessary to enforce the RLA's prohibition against illegal strikes.

In *Chicago River*, the Supreme Court permitted enforcement of the RLA's goals through injunctions against illegal strikes over minor disputes. *Chicago River*, 353 U.S. at 34–36, 77 S.Ct. at 637–38. The Court held that an injunction was necessary to make effective the "unequivocal" language requiring that the Board of Adjustment handle minor disputes that have not been resolved by the parties. *Id.* at 34, 77 S.Ct. at 637. The traditional rule is that "courts should determine the adequacy of a remedy in law before resorting to equitable relief. Under the ordinary convention, the proper inquiry would be whether monetary damages provided an adequate remedy, and if not, whether equitable relief would be appropriate." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1038 (citing *Whitehead v. Shattuck*, 138 U.S. 146, 150, 11 S.Ct. 276, 276, 34 L.Ed. 873 (1891)). Because in *Chicago River* the Supreme Court held that an equitable remedy was appropriate for an illegal strike under the RLA, it first must have considered whether monetary damages provided an adequate remedy and concluded that they did not.

Here, too, the district court correctly determined that CSX's request for an injunction to stop a strike over a minor dispute was appropriate pursuant to *Chicago River*. In doing so, the district court could only have issued an injunction because damages did not provide an adequate remedy; damages could not prevent the strike from occurring, and the strike, resulting in the interruption of service, constitutes the damage to a railroad. However, merely because an award of damages was found to be inadequate, and thus the injunction was appropriate to stave off the harm that damages could not have prevented, does not mean that damages are not an appropriate remedy to compensate for the strike and deter further strikes. *Cf. Bivens v. Six*

*Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 405, 91 S.Ct. 1999, 2009, 29 L.Ed.2d 619 (1971) (because equitable relief is appropriate without explicit congressional authorization, "it seems to me that the same statute is sufficient to empower a federal court to grant a traditional remedy at law.") (Harlan, J., concurring).

As in *Franklin*, here equitable relief may not be sufficient in itself to enforce the RLA's goals or afford CSX an adequate remedy. *See Franklin*, —— U.S. at ——, 112 S.Ct. at 1038. The Supreme Court has held that Section 2, First is the "heart" of the RLA in that it requires parties to "exert every reasonable effort to ... settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute...." *Chicago & N.W. Ry.*, 402 U.S. at 574, 91 S.Ct. at 1734 (quoting 45 U.S.C. § 152, First). The RLA provides for "the more effectual protection of interstate commerce from interruption to such a degree as to deprive any section of the country essential transportation services ... [T]he brotherhood insists, and we think rightly, that the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.'" *Texas & N.O.R. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930). Here, the union sidestepped the "machinery to prevent strikes" by striking illegally. Although CSX obtained an injunction the same day that the strike began, it did not obtain the injunction in time to prevent interruption of service. Therefore, it appears that the RLA's primary goal of avoiding interruptions in rail service cannot be carried out in every instance using only injunctive relief. In conjunction with injunctive relief, the availability of monetary relief could help deter strikes over minor disputes and make effective the RLA's prohibition against interruptions in service over minor disputes. *See Galveston Wharves*, 400 F.2d at 326 ("Back pay is a realistic assurance that there will be 'an impact on the duty to bargain to prevent the employer from get-

ting a windfall from having violated the Act.'") And, injunctive relief only prevents further damage to a railway from a strike, but does nothing to restore the railway to the position where it was before the union's illegal strike. *Id.* (Backpay "will put the employees 'substantially in same position as if Galveston Wharves had complied with the Act.'") Although at this stage of the proceedings it is unclear what damage, if any, CSX actually suffered, it may be that CSX cannot be compensated adequately for the losses incurred from the illegal activity without monetary damages. Thus, CSX's relief may not be complete without a monetary damages remedy.

### D.

The union argues, and the majority concurs, that permitting damages today may upset the balance of power that has developed over the years between labor organizations and railways under the RLA. Because the RLA was bargained for by labor and railways long ago and, until now, no monetary damages have been awarded to remedy illegal strikes, the majority worries that to provide such damages now is to risk upsetting this bargained-for relationship between the parties. I disagree.

In *Kaschak*, a panel of this Court commented on "the unique history behind the RLA."

> Though formulated as a piece of federal legislation, "it was, and was acknowledged to be, an agreement worked out between management and labor, and ratified by the Congress and the President." The provisions of the RLA are, thus, enforceable as quasi-contractual obligations, even absent a § 301–like provision saying so.

707 F.2d at 906. The quasi-contractual nature of the RLA [20] argues against the union's balance of power argument and in favor of a damages remedy for two reasons.

First, damages are typically available under a contract, and thus damages could be appropriate to enforce this joint effort of labor and management. Second, both labor and management bargained for the provisions of the RLA and thus should be bound by them as parties to the quasi contract. In 1934, Section 3, First was added to the RLA, creating the National Railroad Adjustment Board and making it compulsory for minor disputes to be resolved by the Adjustment Board. 45 U.S.C. § 153, First. As noted in *Chicago River*, 353 U.S. at 37–39, 77 S.Ct. at 639, "The change was made with the full concurrence of the national railway labor organizations." *Id.* As noted earlier, the chief spokesman for the railway labor organization at that time stated: "[W]e are now ready to concede that we can risk having our grievances go to a board and get them determined, and that is a contribution that these organizations are willing to make." *Id.* The Supreme Court added, "[T]here was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field." *Id.* at 39, 77 S.Ct. at 640. Therefore, from the very beginning, labor understood that minor disputes must go to the Adjustment Board and not result in strikes. It is not unfair, then, to permit damages against the union for violating this agreement to arbitrate in which it acquiesced more than four decades ago.

---

**20.** *Kaschak,* in referring to the quasi-contractual nature of the RLA, apparently was not referring to "quasi contract" in the traditional legal sense. The legal definition of "quasi contract" is: "[a]n obligation which law creates in absence of agreement; it is invoked by courts where there is unjust enrichment." *Black's Law Dictionary,* at 1120 (5th ed. 1979). The *Kaschak* court, though, was referring to the fact that the RLA was the agreement between labor and railway management and subsequently ratified by Con-

gress. In that context, "quasi" is used as it is defined generally: "as if; in a sense or manner; seemingly; in part." *Webster's New World Dictionary,* at 1163 (1972). The "quasi-contract" *Kaschak* was referring to is "almost a contract." *Kaschak* was focusing on the unique nature of the RLA and the fact that the legislation was like a contract between labor and management in that the two sides had agreed to the provisions of the RLA before it ever went to Congress and the President for ratification.

To hold that monetary damages may be an appropriate remedy for an illegal strike will not upset the current balance of power between the unions and the railways any more than the Supreme Court's 1957 *Chicago River* decision permitting injunctive relief as a remedy for an illegal strike upset the balance of power that had developed during the first 31 years of the RLA. In addition, other courts have found that damages or monetary equitable relief are appropriate under the RLA in different contexts without upsetting the balance of power. These situations include: 1) damages against unions and for employees over a union's breach of the duty of fair representation, *Steele v. Louisville & N.R.*, 323 U.S. 192, 234, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944) (RLA's purposes carried out by damages remedy for discriminatory representation), and *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, Ocean Lodge 76*, 323 U.S. 210, 213–14, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944) (same); 2) damages or backpay against railways or carriers and for employees, *Burke v. Compania Mexicana De Aviacion*, 433 F.2d 1031, 1034 (9th Cir.1970) (implying right to damages under § 2, Fourth for wrongful discharge); *Belton v. Air Atlanta, Inc.*, 647 F.Supp. 28 (N.D.Ga. 1986) (punitive damages may be awarded against employer for interfering with employees' attempts to organize); *Brown v. World Airways, Inc.*, 539 F.Supp. 179 (S.D.N.Y.1982) (damages demand against airline not struck in case involving employer's discharge of plaintiff for union organization activities); *Adams v. Federal Express Corp.*, 470 F.Supp. 1356 (W.D.Tenn. 1979) (backpay available to employee for wrongful discharge), *aff'd*, 654 F.2d 452 (6th Cir.1981); *Brady v. TransWorld Airlines*, 223 F.Supp. 361, 370 (D.Del.1963) (damages available for wrongful discharge under RLA), *aff'd*, 401 F.2d 87 (3d Cir. 1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969); and 3) damages or backpay for unions and against railways or carriers, *Bangor & A.R. v. Brotherhood of Locomotive Firemen & Enginemen*, 442 F.2d 812, 817 (D.C.Cir.1971) (union not entitled to damages for amount railway saved when it failed to hire firemen that would have been hired absent blanking practice because this amount was speculative, but union received damages from railway for dues, assessments, initiation fees and other payments additional firemen would have made); *Galveston Wharves*, 400 F.2d at 320 (backpay appropriate for union for employees laid off when employer violated status quo). *Cf. United Transp. Union v. Florida East Coast Ry.*, 586 F.2d 520, 525 (5th Cir.1978) (statute of limitations applied because union's claim for monetary damages for abrogating the collective bargaining agreement was legal claim.).

In addition, both railroads and unions have been permitted damages as part of the negotiation and arbitration processes set up by the RLA to resolve minor disputes. *See McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n.*, 859 F.2d 1382, 1384 (9th Cir.1988) (adjustment board awards union $19,000 in damages); *Local 553, Transport Workers Union of America v. Eastern Air Lines Inc.*, 695 F.2d 668, 675 (2d Cir.1982) (adjustment board "can interpret contract clauses and award monetary damages"); *Brotherhood of R.R. Trainmen v. Denver & R.G.W.R.*, 370 F.2d 833, 836 (10th Cir.1966) (Board awarded $472,000 to union members and against railway; court upheld constitutionality of RLA amendment making adjustment board's order to pay money damages unreviewable), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456 (1967). In a case where a railway seeks damages to redress an illegal strike that frustrated the RLA's primary goal of avoiding service interruptions, damages may be even more appropriate and necessary than in the cases cited above in which damages were sought merely as a remedy for a minor dispute.

The majority further contends that permitting a damages remedy will deter legitimate strike activity by labor organizations. The majority fears that legitimate strikes over major disputes, arising when the union believes that the railroad has violated the status quo, may be deterred out of fear that the controversy eventually will be de-

termined to be a minor dispute and the union would, as a result, be subject to damages. Although strikes are never permissible over minor disputes and generally are permissible over major disputes only if the RLA's conciliation steps have been exhausted, it has been held that the union may strike over a major dispute immediately if the railroad violates the status quo first and has not restored the status quo before the strike. *See Detroit & T.S.L.R. v. United Transp. Union,* 396 U.S. at 154, 90 S.Ct. at 301 ("The union undoubtedly felt it could resort to self-help if the railroad could, and, not unreasonably, it threatened to strike."); *Atlanta & West Point R. Co. v. United Transp. Union,* 439 F.2d 73, 80 (5th Cir.1971) (" 'the Union had the right to strike; that right continues until the Act is complied with by the Carrier ...' ") *(quoting Galveston Wharves,* 400 F.2d at 333), *cert. denied,* 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed.2d 53 (1971).

A holding that monetary damages may be appropriate to remedy an illegal strike would have no greater chilling effect on the unions' legitimate strike activity than the availability of monetary damages against the railroads for violations of the status quo would have on legitimate activity by the railroads. The RLA's provisions impose reciprocal obligations on unions and management, and nothing in such a holding implies that monetary damages are not available to the union as well as to the railroads to remedy violations of those obligations. *See, e.g., Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Ry.,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960) (authorizing injunctions by union against carrier for minor dispute); *Westchester Lodge 2186 v. Railway Express Agency,* 329 F.2d 748, 752–53 (2d Cir.1964) (same). The majority's contention that a damages remedy would give the railways a lever over the unions ignores the fact that a holding that damages are never appropriate as a remedy for an illegal strike permits the union to strike with impunity over a patently minor dispute merely by unilaterally characterizing the dispute as major and the railway's actions as status quo violations. Thus, it

seems to me that rather than deterring legitimate strike activity by labor organizations, a holding that monetary damages may be appropriate to remedy illegal activity by either the railways or the unions would serve to strengthen the balance of power envisioned by both entities when they initially agreed to the provisions of the RLA.

Under the majority's view that a railway cannot obtain damages even for strikes over disputes that are clearly minor ones, a railway's only recourse is injunction to halt the illegal strike. I am not prepared to say that an injunction, although an important remedy, will always be adequate to prevent and to compensate for illegal strikes by unions. Furthermore, even if the union, out of fear of being subject to damages, should opt not to strike over a dispute as to whose character (*i.e.,* major or minor) it was legitimately uncertain, the union is still left with several options. It can go to the federal courts, just as a carrier can, to enjoin the railway from violating the status quo provisions. *Detroit & T.S.L.R.,* 396 U.S. at 153–54, 90 S.Ct. at 301 (enjoining carrier from changing work conditions during mediation); *Local 553, Transport Workers Union of America v. Eastern Air Lines Inc.,* 695 F.2d 668, 674 (2d Cir. 1982) (citing cases). Or the union can turn to the alternative forum of the Adjustment Board where it can obtain resolution of the dispute. As the Supreme Court stated in authorizing injunctions for illegal strikes,

> the machinery of the Railway Labor Act channeled these economic forces, in matters dealing with railway labor, into special processes intended to compromise them. Such controversies, therefore, are not the same as those in which the [remedy] strips labor of its primary weapon without substituting any reasonable alternative.

*Chicago River,* 353 U.S. at 41, 77 S.Ct. at 640–41. The RLA's arbitration processes provide a reasonable alternative forum so that a union that fears the repercussions of a potentially illegal strike will not be left empty-handed.

The majority states that in the 66–year history of the RLA, no union or railway has ever been awarded damages from one another. Although I agree that no court has awarded a carrier damages against a union, a union at least on one occasion has been the beneficiary of a damages remedy arising from a violation of other provisions of the RLA. *See Bangor & A.R. v. Brotherhood of Locomotive Firemen & Enginemen*, 442 F.2d 812, 817 (D.C.Cir.1971). In *Bangor & A.R.*, the union claimed damages against the railway for failing to replace firemen in the states of Oregon and Washington, which required that railways operating in those states maintain full firemen crews. The D.C. Circuit held that the union was not entitled to recover damages on behalf of its members for the amount the railway saved through the illegal failure to hire firemen because such damages would be too speculative in light of the fact that it was unclear how many of the victims would have been union members. *Id.* at 820. The court, however, held that the union was entitled to recover dues, assessments, initiation fees and other payments that would have been made to the union if the additional firemen had been employed. It noted:

> There may well be an element of uncertainty in the precise amount of damage sustained by the Union. But established principle dictates that the burden of that uncertainty must fairly rest on the wrongdoer.... In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show·[sic] the extent of the damages as a matter of just and reason-

able inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Id.* at 822.

Although I recognize that *Bangor* is unique in awarding damages to a union from a carrier, there is no reason to find that a damages remedy should not be reciprocal, especially in light of the RLA's primary goal of avoiding interruptions in service. As the Supreme Court stated in *Chicago River*, 353 U.S. at 34, 77 S.Ct. at 637, in response to the union's argument that the conciliation procedures for minor disputes were not compulsory, "It is to be doubted that the Brotherhood would support allowing carriers the same right to defeat the jurisdiction of the Adjustment Board that it claims for itself. The statutory language, however, would support no distinction." *Id.* Here, BMWE does not suggest that the railroads may bypass the RLA's conciliation processes and still escape damages. Clearly, the RLA can only be effective if the obligations of the parties are reciprocal.

### IV.

Because the RLA is a relatively unformed statute, few decisions have spoken about damages under the RLA and only a handful about damages for an unlawful strike. I recognize that the Supreme Court has not directly spoken on this issue.[21] I

---

21. In *Brotherhood of R.R. Trainmen v. Toledo, P. & W. R.R.*, 321 U.S. 50, 56, 64 S.Ct. 413, 417, 88 L.Ed. 534 (1944), the Supreme Court did state in dicta that the railroad should not have been awarded an injunction against a strike when the railroad had not first used every reasonable effort to conciliate the major dispute using the RLA's provisions. Noting that "the federal courts were deprived of the power to afford injunctive relief and respondent was remitted to other forms of legal remedy which remained available," *id.* at 56, 64 S.Ct. at 417, the Court cited to another part of its opinion, where it stated:

> Other means of protection remain. Suits for recovery of damages still may be brought in

the federal courts, when federal jurisdiction is shown to exist. Federal statutes supply criminal sanctions, enforceable in the federal courts, against persons who interfere in specified ways with the operation of interstate trains or destroy the property of interstate railroads ... With these and other remedies that may be available we are concerned no further than to point out that respondent's failure to observe the requirements of Section 8 has not left it without legal protection.

*Id.* at 63, 64 S.Ct. at 420 (citations omitted). This language suggests that the Supreme Court believed that a damages remedy was available to the railroad, at least for an illegal strike over a major dispute.

am not troubled by the virtual absence of cases holding that damages are permissible under the RLA for an illegal strike.[22] Railways often drop their damages claims against unions after receiving injunctive relief, so courts seldom address these claims. And, most minor disputes are resolved through the grievance and arbitration procedures mandated by the RLA without illegal strikes, and therefore these disputes do not come into court. Finally, the RLA is a relatively unformed statute, and the courts are just now confronting issues regarding it. *See, e.g., Burlington Northern Ry. v. Brotherhood of Maintenance Way Employes,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (no jurisdiction to enjoin secondary picketing under RLA.)[23] I also recognize that the majority's holding is in agreement with the holdings of the Fifth Circuit and of at least one other district court that have not permitted damages to remedy an illegal strike. In *Burlington Northern Railway v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86, 88–89 (5th Cir.1992), the Fifth Circuit reaffirmed its holding in *Louisville & Nashville Railroad Co. v. Brown,* 252 F.2d 149 (5th Cir.), *cert. denied,* 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958), denying the railroad damages for an illegal strike. The *Burlington Northern* Court first held that the case was not distinguish-

able from *Brown* and that *Brown* prohibits damages whether labelled as damages or awarded as part of equitable relief. *Id.* at 88. It next held that *Brown* was still viable and could not be overruled absent *en banc* consideration or a contrary Supreme Court ruling.[24] *Id.* at 89.

In *Brown,* decided one year after *Chicago River,* the Fifth Circuit held that damages were not available to compensate a carrier for an illegal strike. The *Brown* court held:

The Supreme Court has held that a major purpose of this Act was to provide a machinery for settling railway labor disputes in a manner that would prevent or minimize strikes … However, it does not follow that Congress has, by this announcement, even though stated in terms of "duty," intended to or succeeded in setting up a statutory right of action for damages for a breach of this duty. Where Congress sought to set up a right of action for damages for breach of duty in other management labor situations, it enacted a statute expressly spelling out the nature of the right of action. See 29 U.S.C.A. § 187, and so also in creating a right of action in the civil rights field. 42 U.S.C.A. §§ 1983, 1985, 1986. We do not think that Congress

**22.** Only *Denver & R.G.W. R.R. v. Brotherhood of R.R. Trainmen,* 58 L.R.R.M. (BNA) 2568 (D.Colo.1965), *rev'd on other gds.,* 367 F.2d 137 (10th Cir.1966), *rev'd,* 387 U.S. 556, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1967), has permitted damages for an unlawful strike, although the decision contained no discussion of its reasoning.

**23.** The majority cites this 1987 *Burlington Northern* case for the proposition that Congress, not the courts, should be the ones to sanction a damages remedy at this stage in the RLA's development. This argument is undercut by several factors. First, Congress specifically intended the courts to fashion remedies under the RLA, as is clear from the RLA's legislative history. And, Congress has amended the RLA without indicating that it now intends to take over the job of fashioning remedies. Second, as a panel of this Court held in *Kaschak,* appropriate remedies to enforce the RLA are to be determined by the courts on a case-by-case basis. 707 F.2d at 906. Clearly, Congress would not be in the best position to determine what remedies are appropriate in each factual situation that

may arise. Finally, the *Burlington Northern* Court refused to find an "implied *limit*" on secondary picketing at this stage of the RLA's development. The case, then, argues against the majority's position because the majority's refusal to recognize a damages remedy similarly places a limit on the RLA late in its development that only one other circuit has ever imposed on the RLA in its 66–year history. *Burlington Northern* would counsel that such a limit should only be imposed by Congress, not by this Court.

**24.** The *Burlington Northern* court cites to an article by Harry Lustgarten, *Principles of Railway and Airline Labor Law* (1984), which held that it was "unlikely" that courts in the future would award damages because of the potential impact it could have on unions. Interestingly, an article cited by the *Burlington Northern* court for other propositions in fact strongly advocated in favor of a damages remedy for unlawful strikes over minor disputes. *See* D. Arouca, *Damages for Unlawful Strikes Under the Railway Labor Act,* 32 Hastings L.J. 779 (1981).

here intended to or did create a new statutory right of action for damages of the nature declared upon by the plaintiff in Count One.

*Id.* at 155.

While I agree that *Brown* is not distinguishable from *Burlington Northern* and recognize that *Brown* is the controlling authority in the Fifth Circuit, I disagree with the holdings of our sister circuit in those cases. *Brown* relies on the mistaken belief that Congress must spell out all available remedies when it cares to provide them, and that because the RLA fails to spell out a damages remedy, none exists. *Brown* confuses the distinction between a right of action and a remedy, and mistakenly holds that congressional silence is enough to foreclose a remedy. As discussed earlier, the *Franklin* Court made clear that "what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place." *Franklin,* — U.S. at —, 112 S.Ct. at 1032.[25] Once an implied right of action exists, as it does under the RLA, this Court must presume the availability of all appropriate remedies in the absence of congressional direction to the contrary. *Id.* at —, 112 S.Ct. at 1035. Because a right of action already has been implied under the RLA, neither Congress's silence as to RLA remedies nor its explicit creation of rights of action under other statutes is relevant.[26] What is relevant is whether Congress explicitly rejected a damages remedy under the RLA, which it has not,

and whether a damages remedy is appropriate, which I believe it is.

Neither am I convinced by the district court cases cited by appellees. *National Airlines, Inc. v. Airline Pilots Ass'n Intern.,* 431 F.Supp. 53, 54 (S.D.Fla.1976), held that damages were not available to an air carrier for a union's violation of Section 2, First's duty to exert every reasonable effort to avoid interruption of service. *National Airlines* based its decision on *Brown,* as well as the policy consideration that employers could use a damages remedy as a "weapon with which to keep the unions and their agents in line." *Id.* at 54. However, although the case does not outline the facts involved, it appears that *National Airlines* involved a major dispute and subsequent "losses the [employer] incurs in the course of the collective bargaining process." *Id.* Those facts clearly distinguish *National Airlines* from this case involving an illegal strike over a minor dispute. In any event, I do not believe that a damages remedy for an illegal strike will permit an employer to take "unfair advantage" of a union. And, *Maas v. Frontier Airlines, Inc.,* 676 F.Supp. 224, 227 (D.Colo.1987), which relied on *Brown* and denied damages under the RLA in a case involving a Section 2, Fourth claim based on a wrongful discharge, also is not controlling. *Id.*

The majority argues that this smattering of cases constitutes the "common law" of the RLA governing the issue of whether monetary damages can be an appropriate remedy under the RLA. I would argue that it is neither wise nor appropriate to

---

**25.** The *Burlington Northern* court discounts the *Franklin* decision with a sentence: "*Franklin* holds that damages are available in a suit under Title IX. Again, even if this Court were considering the issue on a clean slate, *Franklin* would not control." 961 F.2d at 88–89 n. 9. The *Burlington Northern* court fails to recognize that the framework set out in *Franklin,* outlining when remedies are available under a recognized right, was set out in broad terms applicable to all statutes.

**26.** The *Brown* Court noted that Congress, when it wanted to create a right of action for damages under other labor management statutes and under civil rights statutes, "expressly spell[ed] out the nature of the right of action." It cited to 42

U.S.C. §§ 1983, 1985 and 1986, as well as to the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 185, 187. *Brown's* reasoning is undercut by *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969), which later permitted an injunction and damages for violation of 42 U.S.C. § 1982 because "all necessary and appropriate remedies" are available once a right is implied. In addition, under Section 301 of the LMRA, courts have implied the availability of all remedies, including damages, to enforce Section 301. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

rely almost exclusively on this single aspect of the RLA's history to determine the appropriateness of a remedy. Part of the historical background of the RLA is its legislative history, and the majority notes in Section II of the opinion that the legislative history expressly indicates that Congress expected that the courts would use all remedies, including damages, to enforce the RLA's provisions. In any case, I do not believe that there has been any "common law" developed that addresses the issue of damages over an illegal strike. At best, there are three cases—two Fifth Circuit cases and one district court case relying on this Fifth Circuit precedent—which address the specific issue of damages over a minor dispute, and only a handful of cases which address damages against or in favor of a union or a railway in other contexts under the RLA. I do not believe these cases are adequate to constitute a sufficient body of "common law" to have established a careful balance of power between labor and management. Instead, these few cases are merely evidence that the Fifth Circuit has taken a position on the issue of damages for an illegal strike, that the issue has not been addressed by other circuits, and that the issue of damages in other contexts under the RLA has seldom been addressed by any court.

Neither would I find, as the majority does, that these cases are sufficient to shift the burden to the party seeking damages to demonstrate why monetary damages are appropriate in a particular case. If *Franklin* requires that we presume the availability of all appropriate remedies and *Kaschak* requires that the appropriateness of a given remedy be determined on a case-by-case basis, it would seem to me that the legislative history of the RLA requires that the presumption be that monetary damages are appropriate unless under the particular circumstances of the case they are shown not to be. I read the majority's opinion as holding that (1) while monetary damages

are available under the RLA, (2) monetary damages can never be appropriate to remedy the damage resulting to a railroad from an illegal strike over a minor dispute, and (3) that for such damages to be held to be appropriate, the railroad must demonstrate their appropriateness, which (4) the railroad in this case has failed to do. I believe that this holding is intrinsically inconsistent. Either damages can never be appropriate to remedy an illegal strike over a minor dispute, in which case, damages are not available as a matter of law in those situations and nothing which the railroad could present would make any difference, or, while damages are available as a matter of law, the appropriateness or non-appropriateness of such damages must be specifically demonstrated under the facts of the particular case. The majority opinion, however, appears to hold that monetary damages are never available in these situations, and that the railroad had the burden to demonstrate that damages are appropriate and failed to sustain that burden. Even if the majority's opinion is read as meaning that the railroad's burden here was to demonstrate broad changes in the industry or in the relationship between the unions and the railways that would justify the awarding of monetary damages, those changes would be matters of fact. Inasmuch as this case was decided on a motion by the union to dismiss, the railroad has had no opportunity to develop the factual basis which might support its contention that under the facts of this case, monetary damages are indeed appropriate.

V.

For the reasons outlined above, I would hold that there may be circumstances in which monetary damages are available to a railroad which suffers damages from a union's strike over a minor dispute, in violation of Section 153, First and Section 152, First of the RLA.[27] I would not go so far

27. I would not, however, adopt CSX's argument that these damages could be characterized as equitable relief and therefore would not be substantially different from injunctive relief, which is permitted under the RLA. CSX argues that

damages would be a penalty or restitutionary measure for the illegal strike. The Supreme Court has held that not all awards of money damages are necessarily legal relief. *Chauffeurs, Teamsters & Helpers, Local No. 391 v.*

as saying that damages are always appropriate to remedy an illegal strike. I only contend that, in this case, I am not prepared to say that the railroad could not present any set of facts which would demonstrate that an award of damages is appropriate. The blanket statement that the majority makes—that damages are not available to a railway for a union's illegal strike—ignores the mandate that a panel of this Court set out in *Kaschak:* that the appropriateness of a remedy under the RLA must be determined on a case-by-case basis. Because this case is only at the motion to dismiss stage, I believe it is wrong to hold that the railway has failed to demonstrate why damages are appropriate in this fact situation. Therefore, I would reverse the district court's granting of the motion to dismiss and remand the case to the district court for further proceedings.

RALPH B. GUY, JR., Circuit Judge, with whom Judge Jones concurs, concurring in part and delivering the opinion of the court in part.

Judge Batchelder concludes that the Railway Labor Act allows a railroad to recover damages from a union that calls a strike over what is later adjudged to be a minor dispute. Since no court in the 66-year history of the RLA has published an opinion allowing such damages, we are forced to confront two questions of first impression. First, given the RLA's silence on remedies, are damages ever available for violations of the Act? Second, if so, are damages *appropriate* for this type of violation? Judge Batchelder answers both questions in the affirmative. We agree that damages are available under the RLA in some circumstances, but we hold damages are not appropriate here.

In *Franklin v. Gwinnett County Public Schools,* ——. U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court clarified the analysis that must be used to determine whether a particular remedy is available under a federal statute. Once an implied right of action has been found, a court must "presume the availability of all *appropriate* remedies unless Congress has expressly indicated otherwise." *Id.,* —— U.S. at ——, 112 S.Ct. at 1032 (emphasis added).

The RLA contains no provisions for private enforcement. However, the legislative history, much of which Judge Batchelder quotes, leaves no doubt that Congress intended for the courts to develop remedies. Within four years of the RLA's enactment, the Supreme Court had held that private parties could enforce its provisions. *Texas & N.O. R.R. Co. v. Brotherhood of Ry. and S.S. Clerks,* 281 U.S. 548, 569–70, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930).

Since the RLA contains an implied right of action, *Franklin* directs us to presume that this right can be enforced by damages in appropriate cases unless Congress has clearly spoken to the contrary. As Judge Batchelder has demonstrated, the legislative history reveals that Congress did not rule out the possibility of damages for violations of the RLA. Therefore, it follows from *Franklin* that damages are available under the RLA in appropriate cases.

The more difficult question is whether this is an *appropriate* case for damages under the RLA. We conclude that it is not.

The legislative history of the RLA demonstrates that Congress intended for the courts to develop private remedies on a case-by-case basis.[1] That is, Congress ex-

---

*Terry,* 494 U.S. 558, 570, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990). Money damages are considered equitable relief when they are restitutionary, such as actions for disgorgement of improper profits, or when they are intertwined with equitable relief. *Id.* at 570, 110 S.Ct. at 1348. Here, CSX is seeking compensation in monetary damages for the injury it suffered from the illegal strike. It is not seeking damages for a violation of the injunction or seeking a repayment of unjust enrichment. Therefore,

characterizing the damages as equitable relief is not appropriate.

**1.** *See* 1 *The Railway Labor Act of 1926—A Legislative History* at 282–84 (1988) (remarks of Representative Newton, floor manager of the bill: "The law for enforcement would be developed in the courts"); *see also* Hearings on H.R. 7180 Before the House Commerce Committee, 69th Cong., 1st Sess. 40 (1926) (remarks of labor spokesman D. Richberg: "[T]he law for such

pected the courts to develop a body of law, analogous to the common law, for the enforcement of the RLA.

The federal courts responded to that challenge by developing appropriate private remedies to redress various types of violations of the RLA. *See, e.g., Texas & N.O. R.R. Co.*, 281 U.S. at 571, 50 S.Ct. at 434 (upholding injunction against railroad to protect employees' right to organize); *Steele v. Louisville & N. R.R. Co.*, 323 U.S. 192, 207, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944) (allowing injunctive relief and damages to redress union's breach of duty of fair representation).

■ Historically, however, the courts have been reluctant to find that damages are an appropriate remedy for an RLA violation.[2] With the exception of awards of damages against unions for breaches of their duty to represent employees fairly, *see Steele*, 323 U.S. at 207, 65 S.Ct. at 234, the federal courts have enforced the RLA almost exclusively through injunctive relief. We are aware of only four published decisions that have approved the use of damages to remedy RLA violations other than breaches of the duty of fair representation. *See Burke v. Compania Mexicana De Aviacion, S.A.*, 433 F.2d 1031, 1034 (9th Cir.1970) (approving damages for employee discharged for union activities); *Belton v. Air Atlanta, Inc.*, 647 F.Supp. 28, 31–32 (N.D.Ga.1986) (same); *Brown v. World Airways, Inc.*, 539 F.Supp. 179, 181 (S.D.N.Y.1982) (same); *Brady v. Trans World Airlines, Inc.*, 223 F.Supp. 361, 370 (D.Del.1963) (approving damages for em-

ployee wrongfully discharged at union's behest), *aff'd*, 401 F.2d 87 (3d Cir.1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 681, 684, 21 L.Ed.2d 691 (1969).[3]

In the 66–year history of the RLA, no federal court has published an opinion holding that a union may recover damages from a railroad or that a railroad may recover damages from a union. On rare occasions, *individual employees* have been allowed to recover damages from their unions or their carriers, but the courts have not permitted the railroads and unions to use the club of damages against each other.

Congress intended for the courts to set up a "common law" for the appropriate enforcement of the RLA. We conclude that the common law that has emerged does not contemplate awards of damages between unions and railroads.

Damages awards between railroads and unions are inappropriate because they threaten the delicate balance intended by the RLA. A court's task in enforcing the RLA "is to implement a remedial scheme that will best effectuate the purposes of the Railway Labor Act, recognizing that the overarching legislative goal is to facilitate collective bargaining and to achieve industrial peace." *International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979).

In *Foust*, the Court reversed an award of punitive damages against a union that had breached its duty of fair representation. The Court agreed that punitive damages would induce unions to represent members

---

enforcement or compulsion should be developed in the courts"). The bill itself was an agreement hammered out between labor and the railroads and ratified by Congress. Therefore, courts have treated the statements of labor and railroad representatives as part of the legislative history. *See, e.g., Chicago & N.W. R.R. Co. v. United Transp. Union*, 402 U.S. 570, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971) (quoting Richberg testimony).

**2.** As Judge Batchelder points out, however, the adjustment boards set up under the RLA have awarded damages in some cases.

**3.** In support of the proposition that damages are generally appropriate under the RLA, Judge

Batchelder cites *United Industrial Workers v. Board of Trustees of Galveston Wharves*, 400 F.2d 320 (5th Cir.1968), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and *United Transportation Union v. Florida East Coast Railway Co.*, 586 F.2d 520 (5th Cir.1978). However, in *Galveston Wharves*, the Fifth Circuit approved the award of *backpay*. 400 F.2d at 327. Backpay is considered to be an equitable remedy because it represents a benefit wrongfully withheld. *See Local No. 391 v. Terry*, 494 U.S. 558, 570, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990). In *Florida East Coast Railway*, the court limited its holding to determining the applicable statute of limitations and did not reach the propriety of the award of damages.

fairly, but decided that such awards could impair unions' financial stability and thereby upset the careful balance of interests necessary to achieve the purposes of the RLA. *Id.,* 442 U.S. at 48, 50–51, 99 S.Ct. at 2125, 2127. *See also Brotherhood of Ry. Carmen v. Delpro Co.,* 579 F.Supp. 1332, 1335–36 (D.Del.1984) (holding that award of punitive damages against *carrier* would undermine purposes of RLA).

With this general background in mind, we now turn to the specific question of whether damages are appropriate to remedy a union's violation of its duty to refrain from striking over a minor dispute. In 1957, the Supreme Court held that injunctive relief is appropriate to enforce the union's duty to submit such minor disputes to a conference. *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R. Co.,* 353 U.S. 30, 39–42, 77 S.Ct. 635, 640–41, 1 L.Ed.2d 622 (1957). Since 1957, the courts have approved such injunctive relief on many occasions. *See, e.g., Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n,* 855 F.2d 1277, 1287 (7th Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988); *Louisville & N. R.R. Co. v. Brotherhood of Locomotive Eng'rs,* 297 F.2d 608, 609 (6th Cir.1961), *aff'd,* 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963).

One year after *Chicago River* approved the use of an injunction to stop a strike over a minor dispute, the Fifth Circuit decided that a damages remedy was not available to a railroad that had been injured by such a strike. *Louisville & N. R.R. Co. v. Brown,* 252 F.2d 149, 155 (5th Cir.), *cert. denied,* 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958).

Eighteen years after *Brown* was decided, a district court within the Fifth Circuit reaffirmed its holding. *National Airlines, Inc. v. Airline Pilots Ass'n Int'l,* 431 F.Supp. 53 (S.D.Fla.1976). Like the Supreme Court's opinion in *Foust,* the *National Airlines* decision explained that a

damages remedy could impair the labor-management relationship intended by the RLA:

> The life cycle of labor-management bargaining is heated and oftentimes results in bitter accusations. Representatives attempt to secure the best possible terms for their respective sides. To create a right of action in favor of an employer against a union and its collective bargaining representatives for losses the former incurs in the course of the collective bargaining process would, in effect, give the employer a weapon with which to keep the unions and their agents "in line." Surely, neither Congress nor the Appellate Courts would fashion a remedy which would give the employer a lever upon which to gain such an unfair advantage.

*National Airlines,* 431 F.Supp. at 54. Accordingly, the court, which had issued an injunction against the union, dismissed the carrier's claim for damages. *Id.* at 54–55.

Most recently, the Fifth Circuit reconsidered *Brown* in *Burlington Northern Railway Co. v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86 (5th Cir. 1992). The court, noting that neither the Supreme Court nor any other circuit had visited the issue since 1958, concluded that *Brown* remains good law. *Burlington Northern,* 961 F.2d at 89.

■ No published opinion has ever held that a carrier may recover damages against a union for an illegal strike over a minor dispute.[4] Of course, the decisions of the Fifth Circuit do not bind us. However, since at least 1958, the RLA "common law" has been that a railroad may not recover damages for a strike over a minor dispute.

Congress envisioned that the courts would set up a body of law to enforce the RLA. The resulting body of law has not permitted railroads and unions to recover damages against each other generally and,

---

4. However, in an *unreported* case, a district court, without discussion, awarded damages to a railroad for an illegal strike. *Denver & Rio Grande W. R.R. v. Brotherhood of R.R. Trainmen,* 58 L.R.R.M. (BNA) 2568 (D.Colo.1965),

*rev'd on other grounds,* 367 F.2d 137 (10th Cir. 1966), *rev'd,* 387 U.S. 556, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1967). On remand, the damages award was not reinstated.

particularly, in the situation presented in this case. After 66 years, a court should be reluctant to change the balance that has been struck between railroads and unions. At a minimum, a party requesting such a change should be required to demonstrate why the remedies that have been appropriate for 66 years are no longer good enough.

CSX has made no such demonstration. We have no reason to believe that the need for damages to deter illegal strikes over minor disputes is any greater today than it was when *Brown* was decided in 1958 or when the RLA was enacted in 1926.

By contrast, the concerns that weigh against such a remedy are as present today as they ever were. In the volatile atmosphere of labor-management relations, the threat of a damages action could upset the balance intended by the RLA.

The problem is particularly acute in a case such as this where the union cannot know with certainty at the time it calls a strike whether a court will later decide that the dispute was minor or major. If damages were available and the union guessed wrong, it would be liable for damages that could deplete the union treasury and impair its effectiveness as the collective bargaining agent. *Cf. Foust,* 442 U.S. at 50–51, 99 S.Ct. at 2127. This threat of crushing financial loss allows the carrier to keep the union "in line" and the employees off the picket line even in cases where the dispute is later adjudged to be major. *See National Airlines,* 431 F.Supp. at 54.

Even if CSX could point to modern developments justifying an award of damages under the RLA, such an argument properly should be made to Congress. Five years ago, the Supreme Court considered for the first time a claim that the RLA implicitly bars secondary picketing. *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). The Court rejected this novel claim:

> We decline, *at this advanced stage of the RLA's development,* to find in it an implied limit on a union's resort to secondary activity. Instead, "if Congress should now find that abuses in the nature of secondary activities have arisen in the railroad industry ... *it is for Congress, and not the Courts, to strike the balance 'between the uncontrolled power of management and labor to further their respective interests.'* "

*Id.* at 452–53, 107 S.Ct. at 1855 (citation omitted) (emphasis added). If changes in the industry merit the result CSX seeks, Congress, not the courts, should create the appropriate remedy.

An award of damages would change the careful balance between labor and management that has evolved in the 66 years since the RLA was enacted. Since CSX has not shown that any change in the industry or the law warrants such a result, we AFFIRM the decision of the district court to dismiss CSX's claim for damages.